**MORGAN GUARANTY TRUST CO. OF NEW YORK**

v.

**THIRD NATIONAL BANK OF HAMP-DEN COUNTY et al.**

Civ. A. No. 71–1390–F.

United States District Court, D. Mass.

June 11, 1975.

William T. Conlan, Daniel B. Bickford, Ely, Bartlett, Brown & Proctor, Boston, Mass., for plaintiff.

Elmer W. Beasley, Hartford, Conn., Philip A. Brooks, Springfield, Mass., for defendants.

## OPINION

FREEDMAN, District Judge.

The matter before the Court arises out of a series of loan transactions between the Third National Bank of Hampden County, Springfield, Massachusetts ("Third Bank"), and Mr. Robert Bialkin, purportedly a resident of Ludlow, Massachusetts, which began on October 6, 1969 and ended January 30,

1970, wherein Bialkin pledged United States Bearer Bonds and Treasury Bills as security for the loans. Two of the pledged Treasury Bills had previously been stolen from Morgan Guaranty Trust Company ("Morgan") of New York, New York, the plaintiff herein. Morgan brought this case against Third Bank and Bialkin [1] to recover for the alleged conversion of the two bills. The Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1332, there being complete diversity of citizenship and an amount in controversy exceeding $10,000 exclusive of interest and costs.

The case was tried before the Court without a jury on January 22–23, 1975. After extensive review of the testimonial and documentary evidence presented by the parties, the Court has concluded that its verdict must be in favor of the plaintiff. This opinion contains the Court's findings of fact and conclusions of law. See Fed.R.Civ.P. 52(a).

On October 16, 1969, an eight million dollar block of United States Treasury Bills, issued October 9, 1969, and due April 9, 1970, were stolen from Morgan's "burglar proof" basement vault at 15 Broad Street, New York, New York. Of significance here, Treasury Bills 478335A and 478340A, each with a face value of $50,000, were among the securities stolen.

Morgan's Government Bond Dealer Section had authorized that day the withdrawal of 85 Treasury Bills totalling eight million dollars. The bills were taken from their place of storage in Morgan's basement vault and delivered to its Custody Incoming Section located on a secured floor in the same building. The bills were to be processed there, deposited in a customer's account, and then delivered back to the basement vault.

After Robert Ankner of Morgan's Custody Incoming Section counted, verified and receipted for the eight million dollar block of bills, he gave them to a typist in the same secured area, along with a multicopy manifold for its completion, including the typing of the serial numbers of the Treasury Bills thereon. The bills and manifold were then returned to Ankner who again counted the bills and verified that the correct serial numbers had been recorded on the manifold. Treasury Bills 478335A and 478340A were among those accounted for and listed on the manifold.

The Treasury Bills and the accompanying manifold were then taken to three proof clerks in the Custody Incoming Section who removed a copy of the manifold for control purposes. After this processing, all of the Treasury Bills and the remaining attached copies of the manifold disappeared.

Upon discovering that the bills were missing, Morgan notified the appropriate law enforcement officials. It also caused the dissemination of thousands of "notices of lost securities" to bankers and brokers throughout the country. These notices, dated October 28, 1969, alerted financial institutions not to purchase the bills listed therein or to accept them as collateral for loans. Treasury Bills 478335 and 478340, each with a face value of $50,000 and an April 9,

---

1. On November 2, 1970, in the United States District Court for the District of Massachusetts, Bialkin pleaded guilty to five counts of having wilfully and knowingly pledged as security for five loans he obtained from Third Bank, four $10,000 Treasury Bills and two $50,000 Treasury Bills, which had moved in interstate commerce from New York, New York, to Springfield, Massachusetts, knowing that these bills had been stolen, unlawfully converted and unlawfully taken, in violation of 18 U.S.C. § 2315. He was sentenced to five years in prison, but the prison sentence was suspended, and he was placed on probation for five years on the condition that he periodically submit himself for psychiatric examination and treatment during the probationary period.

Defendant Bialkin did not file any pleadings in response to Morgan's complaint. Accordingly, he has been defaulted. Neither he nor his representative were present at trial.

1970 due date, were listed as being among the missing bills.[2]

On October 6, 1969, Edward Dominique[3] introduced Robert and Frances Bialkin to George V. MacLeod, manager of Third Bank's Indian Orchard (Massachusetts) branch office. Dominique was known to MacLeod as a Third Bank customer of long-standing with an excellent credit rating. In fact, MacLeod had personally given Dominique home improvement, personal and car loans which had all been repaid strictly in accordance with their terms.

Dominique introduced Bialkin to MacLeod as a relative who had some Treasury Bonds that he intended to cash at the Federal Reserve Bank in Boston. Dominique had suggested, however, that Bialkin come to Third Bank, open a checking account, and see if the bonds could be processed there.

MacLeod opened a checking account for the Bialkins who gave Dominique's address, 111 Barna Street, Ludlow, Massachusetts, as being their own. Bialkin then applied for a loan offering as security two $10,000 United States Bearer Bonds which were due to mature on November 15, 1973. Bialkin stated he needed the loan to meet the payroll and construction costs of a shopping center he was building in Tilton, New Hampshire. At trial, Mr. MacLeod stated that Tilton was approximately 100 miles from Springfield.

Since Mr. MacLeod did not have the authority to make loans of this size secured by negotiable securities, he telephoned Mr. Edward P. Welker, a loan officer at Third Bank's main branch with the appropriate authority. MacLeod apprised Welker of the information he knew at that time—essentially, that Bialkin, a relative of a long-standing customer with an excellent reputation, desired a loan secured by Treasury Bonds to build a shopping center in Tilton, New Hampshire. Neither Welker nor MacLeod inquired further into Bialkin's background. They also neglected to ask any question about the shopping center supposedly being built a great distance from Springfield. Nevertheless, Welker approved the loan. Thus on October 6, 1969, MacLeod, with Welker's approval, made the first loan to Bialkin for $18,000. The two $10,000 Treasury Bonds were pledged as security for the loan.

The next day, Bialkin reappeared with 10 United States Bearer Bonds with a total face value of $34,000. Using these as security, Bialkin procured a second loan of $20,000 from MacLeod with the approval of Welker.

A third loan between Bialkin and MacLeod, with Welker's approval, was consummated on November 6, 1969. Bialkin pledged two Treasury Bonds with a total face value of $11,000 as security for an $8,000 loan. Less than two weeks later, the Third Bank, upon instructions

---

2. The suffix A was not included in the serial numbers of any of the "lost" bills listed in the notice by Morgan. Third Bank contends that this omission is fatal to proper notice, but the Court disagrees. Certainly the inclusion in the notice of the six numbers in the serial number, the due date of the bills and their face amount was sufficient identification to put any person or institution on notice that a certain bill was among the missing. The Federal Reserve Bank itself omits the suffix in serial number lists it sends to banks or other financial institutions. Furthermore, as we shall see, when officials of Third Bank belatedly examined their lost securities file and discovered an identical numerical match between two of the bills listed in the Morgan notice and two of the bills pledged by Bialkin as collateral for loans he had received from Third Bank, they took prompt action to determine whether their collateral was among the lost bills. In sum, Morgan's notice was sufficient in theory and in actuality.

3. Third Bank filed a third-party complaint against Edward Dominique, seeking to recover from him any loss it might sustain as a result of Morgan's claims. Dominique filed an answer to this complaint, *pro se* and denied most of the allegations therein. Neither he nor his representative appeared at trial.

from Bialkin, sold all of the bonds received as collateral up to that time from Bialkin. The proceeds were sufficient to pay off the three loans and to credit the Bialkins' checking account with the sum of $11,460.21.

On December 12, 1969 and January 6, 12 and 13, 1970, MacLeod, with the approval of Welker, made four more loans to Bialkin. The loan of January 12, in the amount of $31,000, was used by Bialkin to pay off the two earlier loans of $8,000 and $16,500. The January 13 loan was for $8,000. As a result of these four transactions, Bialkin was indebted to Third Bank in the amount of $39,000.

Bialkin pledged two $5,000 United States Bearer Bonds as security for the December 12 loan. Collateral for the three subsequent loans was four stale $10,000 United States Treasury Bills all of which had been due on June 26, 1969.[4]

On January 23 and 30, 1970, MacLeod, with Welker's approval, gave two additional loans of $40,000 and $42,000, respectively, to Bialkin. Security for the January 23 loan was a $50,000 United States Treasury Bill bearing serial number 478335A. Bialkin pledged another $50,000 Treasury Bill, with serial number 478340A, as collateral for the January 30 loan. Both Treasury Bills were due April 9, 1970 and were, in fact, two of the bills reported missing by Morgan.

Third Bank had received Morgan's notice of October 28, 1969 before it took the two $50,000 Treasury Bills as collateral from Bialkin. When such notices are received by the bank, they are normally handed to the person in charge of the Securities Department who, as a matter of routine procedure, disseminates copies to the larger branch offices and to the Trust and Collateral Departments. A copy of Morgan's notice was in fact sent to the Discount and Collateral Department (Welker's Department) where it was placed in a file by Mrs. Estelle DeMetropolis, the Collateral Clerk. Although Third Bank had received similar notices of lost securities in the past and had caused copies to be distributed to the relevant departments and branches, neither MacLeod nor Welker thought to check whether the bills had been reported lost or stolen. In fact, neither MacLeod, nor Welker, nor indeed, Mr. Wilson Brunel, President of Third Bank, was aware of the existence of a lost securities file kept by the Bank.

MacLeod, with approximately 40 years of banking experience, had never dealt with a Treasury Bill before he met Bialkin. He was not acquainted with the portion of the Uniform Commerical Code pertaining to the handling of securities. Moreover, neither he nor Welker knew what a stale bill was; much less the significance of such a bill as notice of adverse claims. Despite their inexperience in this type of transaction, neither man had the prudence to ask, during the course of their dealings with Bialkin which involved large sums of money, any further questions about Bialkin's background, his financial reputation, or the shopping center he was building in Tilton, New Hampshire.

On February 3, 1970, while Welker was reviewing certain recent loans, it occurred to him that Bialkin's outstanding loan total was a great deal larger than he had previously thought.[5] He then asked Mr. Gary Babineau, the head discount teller, "If these [bills] had been stolen, how can we verify that?" Babineau stated in response, "We have a stolen list file that we can look at." Soon thereafter, Welker and several other bank employees scrutinized their lost securities file and found the Morgan notice of October 28, 1969. When they

4. These four $10,000 Treasury Bills were subsequently found to have been among the Treasury Bills reported missing by White, Weld & Company, of New York City, in June, 1969.

5. At this time, Bialkin's outstanding loan balance was $90,600.

discovered an exact numerical match between the serial numbers of two of the Treasury Bills listed on Morgan's notice and the two $50,000 Treasury Bills pledged as collateral by Bialkin for his last two loans from MacLeod, the officials called the Federal Reserve Bank of Boston and then the FBI who verified that the collateral was indeed part of the eight million dollar block of bills stolen from Morgan.

The next day, Third Bank seized the Bialkins' bank accounts. During February, it used the moneys in these accounts and the proceeds from the sale of the remaining bearer bonds it was holding as collateral to reduce the Bialkins' loan balance to $78,335.26. Then, on April 9, 1970, Third Bank presented the two $50,000 Treasury Bills to the Federal Reserve Bank of Boston and received in return the sum of $100,000. On April 10, 1970, it paid off the Bialkins' loan balance, plus a small amount of accrued interest, out of the proceeds of the Treasury Bills. The surplus of $21,247.97 was paid the following day to Morgan. Consequently, Morgan seeks to recover here the difference between the amount already tendered to it and the $100,000 received by Third Bank in its sale of the two Treasury Bills.

▪ In diversity cases, the federal courts must use the conflict of laws rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Thus, this Court, sitting in Massachusetts, must use the conflict of laws rules of the Commonwealth. Since securities are involved here, Massachusetts courts would apply the choice of law provision in the Massachusetts version of the Uniform Commercial Code ("U.C.C." or "the Code"), M.G.L. c. 106, § 1–105, to determine whether the law of Massachusetts or New York should apply. That section provides that absent an agreement between the parties specifying that the

transaction is to be governed by the law of a state bearing a "reasonable relation" to the transaction, the Massachusetts version of the U.C.C. shall govern ". . . transactions bearing an appropriate relation to . . . [Massachusetts]." M.G.L. c. 106, § 1–105. *See Skinner v. Tobor Foreign Motors*, 345 Mass. 429, 187 N.E.2d 669 (1963).

▪ In the present case, there was, of course, no prior agreement between the parties. Thus, the Court must apply the "appropriate relation" test. Certainly Massachusetts, the situs of the loan transactions, bears an "appropriate relation" to the transactions involved herein. Moreover, all of the defendants either reside in or have their principal place of business in Massachusetts. Accordingly, the Court will apply the substantive law of Massachusetts as declared by the General Court (legislature) or as interpreted by its highest court. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

▪ Although United States Treasury Bills are both negotiable instruments [6] and investment securities,[7] they are governed by Article 8 of the U.C.C, dealing with investment securities, rather than Article 3 which pertains to commercial paper. M.G.L. c. 106, § 8–102(1)(b).

Morgan alleges that Third Bank's receipt of the two $50,000 Treasury Bills as collateral and its subsequent cashing of the same, amounts to an unlawful conversion of the bills. Suits in conversion, a common law tort, are not specifically provided for in Article 8. Yet the Code's authors envisioned that such suits would be brought, because Article 8 contains a provision insulating good faith agents and bailees of securities from liability for conversion. M.G.L. c. 106, § 8–318. *See* M.G.L. c. 106, § 8–315 (U.C.C. Comment # 2). Furthermore, the Code's "gap provision," M.G.L. c. 106, § 1–103, contemplates such ac-

6. *See* M.G.L. c. 106, §§ 3–104 and 8–105(1).

7. *See* M.G.L. c. 106, § 8–102(1)(a)(i–iv).

tions as being supplementary to those based upon an actual Code provision.[8] *See National Shawmut Bank of Boston v. Vera,* 352 Mass. 11, 16, 223 N.E.2d 515 (1967).

As a general matter, tortious conversion is defined as:

"an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the full value of the chattel."

Restatement of Torts 2d, Vol. 1, § 222A(1).

With respect to the action at bar, the case of *Varney v. Curtis,* 213 Mass. 309, 100 N.E. 650 (1913), is instructive because it holds that a pledgee who takes a security into his possession from one not its true owner, with notice of the rights of the true owner, as collateral for a debt owed to him by the pledgor, is liable in conversion. Conversely, *Varney* also holds that a pledgee who takes a security as collateral in good faith without notice or knowledge of the rights of the security's true owner, is not liable for conversion as long as he does not exercise any further act of dominion over the security. *Varney v. Curtis, supra,* at 316–17, 100 N.E. 650.

The Code's definition of a "bona fide purchaser" ("BFP") is quite similar to the latter holding in *Varney.* A BFP is defined as "a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form . . . ." M.G. L. c. 106 § 8–302. Such a purchaser "acquires the security free of any adverse claim . . . that a transfer was or would be unauthorized or wrongful or that a particular adverse person is the owner or has an interest in the security." M.G.L. c. 106, § 8–301.

Third Bank took the two $50,000 Treasury Bills from Bialkin as collateral for two sizable loans. Whether Third Bank took them in good faith and without notice is determinative of Third Bank's liability herein. Stated differently, and more properly in the context of the Code, was Third Bank a BFP when it took possession of the bills?

The Code regards Third Bank, which became a pledgee upon its taking the bills as collateral from Bialkin, as a "purchaser" of the bills. M.G.L. c. 106, § 1–201 (32–33). Furthermore, it gave "value" for them. M.G.L. c. 106, § 1–201(44)(a). It likewise acted in subjective "good faith" throughout the course of its transactions with Bialkin. M.G.L. c. 106, § 1–201(19). Whether it took without notice is another matter.

Under the Code,

"[a] person has 'notice' of a fact when . . . (b) he has received a notice or notification of it . . . ." M.G.L. c. 106, § 1–201(25).

He " 'receives' a notice or notification when . . . (b) it is duly delivered . . . at any . . . place held out by him as the place for receipt of such communications." M. G.L. c. 106, § 1–201(26)(b).

Such " . . . a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting the transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains *reasonable routines* for communicating significant information to the person conducting the transaction and there is *reasonable compliance* with the rou-

8. M.G.L. c. 106, § 1–103:
"*Supplementary General Principles of Law Applicable.*
Unless displaced by the particular provisions of this chapter, the principles of law and eq-
uity, . . . shall supplement its provisions."

tines. Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of his regular duties or unless he has reason to know of the transaction and that the transaction would be materially affected by the information."

M.G.L. c. 106, § 1–201(27) (emphasis added).

■ Third Bank had received Morgan's notice of loss before it took the two $50,000 Treasury Bills as collateral from Bialkin. A copy of that notice was sent, as a matter of routine, to the Discount and Collateral Department by an employee of the Securities Department. Yet Mr. Welker, the supervisor of the Discount and Collateral Department, was not aware that his department kept a lost securities file. This fact is persuasive in convincing the Court that Third Bank's channels for communicating significant information about lost securities fell far short of being described as "reasonable." Persons in the Securities Department evidently felt that the information contained in the notices was important enough to have copies disseminated throughout the bank. Yet these copies were filed in the Discount and Collateral Department without any reasonable effort to inform the relevant individuals in that department of their existence. Had Third Bank exercised due diligence here, a man in Welker's position certainly would have been aware of the file.[9] Thus, the Court holds that Third Bank had notice

of Morgan's lost securities prior to its receipt of the $50,000 Treasury Bills as collateral from Bialkin. Therefore, it does not qualify as a BFP, but instead, is guilty of converting the two $50,000 Treasury Bills when it took them into its possession.[10]

Third Bank claims that M.G.L. c. 106, § 8–318 protects it from liability in conversion. That section provides:

"An agent or bailee who in good faith (including observance of reasonable standards if he is in the business of buying, selling or otherwise dealing with securities) has received securities and sold, pledged or delivered them according to the instructions of his principal is not liable for conversion . . . although the principal had no right to dispose of them."

M.G.L. c. 106, § 8–318.

■ Third Bank's reliance upon this provision is misplaced for a number of reasons. Preliminarily, the statute contemplates the protection of a mere good faith conduit who disposes of the securities upon the instructions of his principal. Third Bank was not such a conduit. Its sale of the bills was not upon the instructions of its principal. It sold the bills *after* it knew they were stolen and *after* it knew that Bialkin was a thief. This knowledge also negates any contention that the sale itself was made in good faith.

■ Furthermore, it is doubtful whether Third Bank was acting in "good faith," as it is defined in § 8–318,[11]

9. The Court is cognizant of the Court of Appeals' statement in *Bowling Green, Inc. v. State Street Bank and Trust Co.*, 425 F.2d 81, 85 (1st Cir. 1970), that "[t]he Code's definition of 'notice' . . . focuses on the actual knowledge of the individuals allegedly notified." This statement, however, was in reference to the Code's general definition of "notice" which is embodied in M.G. L. c. 106, § 1–201(25). In contrast, the Court's decision today is predicated upon an interpretation of M.G.L. c. 106, § 1–201(27) which, in part, provides an objective standard for determining when an organization receives notice.

10. In light of the Court's decision herein, it will not be necessary to decide if Third

Bank was guilty of converting the Treasury Bills when it sold them. Such a sale could quite possibly be construed as a further act of dominion over the bills which was inconsistent with the rights of their owner. *See*, *Varney v. Curtis, supra*, 213 Mass. at 316–317, 100 N.E. 650.

11. In contrast to the "honesty in fact" definition of "good faith" in M.G.L. c. 106, § 1–201(19), M.G.L. c. 106, § 8–318 requires an objective test of "good faith" if the agent or bailee deals in securities. *Industrial National Bank of Rhode Island v. Leo's Used Car Exchange, Inc.*, 1973 Mass.Adv.Sh. 79, 291 N.E.2d 603, 606 (1973). Since Third Bank is in the business of dealing with securities, the objective standard applies here.

when it took the bills. As stated above, its methods of communicating notice of lost securities was less than adequate. It violated the "know your customer" rule [12] repeatedly by failing to find out anything about Bialkin's background besides his kinship to Dominique. Moreover, it accepted four $10,000 Treasury Bills, more than six months overdue, as collateral for earlier loans to Bialkin. Under the Code, it took these bills with notice of adverse claims. M.G.L. c. 106, § 8–305(b). While the taking of these stale bills cannot be construed as giving the bank notice that there were adverse claims to the bills it subsequently took from Bialkin, it is evidence of Third Bank's failure to observe reasonable business standards throughout the course of these transactions.

▇ Third Bank asserts that the doctrine of equitable estoppel should be applied here. That doctrine can be defined simply as "the familiar principle 'that where one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss, must sustain it.'" *National Safe Deposit, Savings & Trust Co. v. Hibbs*, 229 U.S. 391, 394, 33 S.Ct. 818, 819, 57 L.Ed. 1241 (1913). Applied to the facts of this case, the contention is that Morgan should bear the loss rather than Third Bank because the former "intrusted" the bills to its employees who made the loss possible.

As authority for this proposition, Third Bank cites a line of cases [13] emanating from Justice Holmes' decision in

*Russell v. American Bell Telephone Co.*, 180 Mass. 467, 62 N.E. 751 (1902). In that case a distinction was made between "the ordinary and typical case of theft [where] the owner has not intrusted the agent with the document," *Id.* at 469, 62 N.E. 751, and the situation where there has been an intrustment. Only in the latter case are the owner's actions sufficiently egregious to warrant the application of the doctrine.

▇ In each case in which the owner of securities was estopped from asserting his rights in them, the owner has actively or constructively intrusted the securities in disposable form, in the hands of one who, without authority, places them into commerce *via* an innocent party. There is some question here whether Morgan employees were intrusted with, or merely had access to, the bills. Yet that question, in the Court's mind, is not determinative of the issue because the identity of the thief is still unknown. Perhaps one of Morgan's trusted employees did in fact steal the bills; but perhaps not. Absent the resolution of this question, the Court is unwilling to charge Morgan with the onus of having intrusted the bills to the party who illegally placed them into the stream of commerce. As such, this case is closer to the situation of the "ordinary and common case of theft [where] the owner has not intrusted the agent with the document." *Russell v. American Bell Telephone Co.*, supra, at 469, 62 N.E. 751. As was stated above, the doctrine of equitable estoppel is not applied in this type of situation.[14]

---

12. The Court accepts the following rule as a general statement of the standard of care that must be exercised by an institution or person dealing in securities: "Every . . . [person] is required to use due diligence to learn the essential facts relative to every customer. . . ." Boston Stock Exchange, Rules of the Board of Governors, Ch. VII, ¶ 2091.

13. *National Safe Deposit, Savings & Trust Co. v. Hibbs, supra; Loring v. Goodhue*, 259 Mass. 495, 156 N.E. 704 (1927); *Jerome v. Eastern Finance Corp.*, 317 Mass. 364, 58 N.E.2d 122 (1944); *Bunge Corp. v. Manu-*

*facturers Hanover Trust Co.*, 31 N.Y.2d 223, 335 N.Y.S.2d 412, 286 N.E.2d 903 (1972).

14. It is arguable that the inclusion in Article 8 of §§ 8–301–302 and 318, protecting *bona fide* purchasers and good faith agents and bailees from liability in conversion, effectively displaces the doctrine of equitable estoppel as a viable theory in determining the rights of the parties in a case governed by Article 8. *But see Bunge Corporation v. Manufacturers Hanover Trust Co.*, 31 N.Y. 2d 223, 335 N.Y.S.2d 412, 286 N.E.2d 903 (1972). Since the Court has held that the doctrine is not applicable here, there is no need to discuss the displacement issue.

At this point in time, Morgan, through its employees, can at most be held to having been negligent or careless in the handling of the bills. Such negligence or ". . . carelessness in the charge of property does not bar the owner . . . from proceeding against a converter of the property." *Union Old Lowell National Bank v. Paine*, 318 Mass. 313, 325, 61 N.E.2d 666, 672 (1945). *See Varney v. Curtis, supra*, 213 Mass. at 312, 100 N.E. 650. Consequently, Morgan is not estopped from asserting its rights in the two $50,000 Treasury Bills sold by Third Bank.

To summarize, the Court finds that Third Bank is guilty of converting Treasury Bills Nos. 478335A and 478340A. It was not a BFP when it took the bills. Nor does M.G.L. c. 106, § 8–318 protect it from liability. Moreover, Morgan is not estopped from seeking to recover the value of the bills.

Accordingly, judgment is entered for the plaintiff Morgan in the amount of $78,752.03.[15]

So ordered.

15. No evidence was produced at trial which cast liability upon third-party defendant Edward Dominique. Accordingly, judgment is entered dismissing the third-party action against him.