972 F.2d 1183
 18 UCC Rep.Serv.2d 545, 36 Fed. R. Evid. Serv. 500
 BROADCORT CAPITAL CORPORATION, Plaintiff-Appellee,
v.
SUMMA MEDICAL CORPORATION, a New Mexico corporation,
Defendant/Third-Party Plaintiff-Appellant,
v.
MERRILL, LYNCH, PIERCE, FENNER & SMITH, INC., a Delaware
corporation, Third-Party Defendant.
 No. 91-2160.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 17, 1992.
 
 Michael E. Vigil, of Marchiondo, Vigil & Voegler, P.A., Albuquerque, N.M., for the defendant/third-party plaintiff-appellant.
 Robert M. St. John (Rex D. Throckmorton and Edward Ricco of Rodey, Dickason, Sloan, Akin & Robb, P.A., with him on the brief), of Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, N.M., for the plaintiff-appellee and third-party defendant-appellee.
 Before SEYMOUR and TACHA, Circuit Judges, and BENSON, District Judge.*
 TACHA, Circuit Judge.
 
 
 1
 Appellant Summa Medical Corporation (Summa) appeals from a jury verdict in favor of appellee Broadcort Capital Corporation (Broadcort). On appeal, Summa raises nine issues: (1) whether Broadcort proved a prima facie case; (2) whether Broadcort had standing to sue; (3) whether error was committed in dismissing Summa's third-party complaint against Merrill, Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch) because of a failure of proof; (4) whether error was committed in submitting a conversion claim to the jury; (5) whether error was committed in submitting monetary damages to the jury; (6) whether the damage award was excessive; (7) whether error was committed in submitting punitive damages to the jury; (8) whether error was committed in admitting into evidence settlement discussions; and (9) whether the district court abused its discretion by refusing to allow a witness to testify as an expert. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.
 
 BACKGROUND
 
 2
 On March 9, 1988, Broadcort filed an action in the United States District Court for the District of New Mexico against Summa. The complaint sought (1) a declaration that Summa was obligated to transfer and register a stock certificate, (2) indemnity for all losses that Broadcort sustained as a result of the alleged wrongful refusal of Summa to permit registration and transfer of the stock certificate, (3) money damages in an amount that would permit Broadcort to purchase 769,600 shares of Summa stock, (4) attorneys' fees, and (5) punitive damages.
 
 
 3
 Summa denied that it was obligated to register transfer of the stock certificate and asserted, among other things, that Merrill Lynch--not Broadcort--was the real party in interest. Summa also filed a third-party complaint against Merrill Lynch, asserting claims for negligence and breach of warranty. The district court granted summary judgment in favor of Merrill Lynch on these claims. By an amended third-party complaint, Summa asserted a claim against Merrill Lynch for fraud, which the district court dismissed at the close of the evidence.
 
 
 4
 After the jury trial, Broadcort's claims under N.M.Stat.Ann. § 55-8-401 and for conversion were submitted to the jury, which returned a verdict in Broadcort's favor on both theories. The jury awarded Broadcort $1,600,000 in compensatory damages and $400,000 in punitive damages.
 
 
 5
 Viewing the record in the light most favorable to Broadcort,[1] the evidence reveals the following. This action involves a stock certificate, number 21351, which represented 875,000 shares of Summa common stock. Summa issued the certificate on July 23, 1987--without restriction of any kind--in the name of Metro Title and Escrow Company (Metro), which was controlled by A.V. Laurins.[2] Summa issued and delivered the certificate to Metro allegedly to serve as collateral for a loan from Metro to Scout Petroleum, Inc. (Scout), a Summa subsidiary. Scout was then to forward the loan proceeds to Summa. This particular transaction was the third in a series of loan transactions that involved Laurins (or one of his companies) and Summa--all arranged through Lincoln Capital Advisory Corporation (Lincoln Capital).
 
 
 6
 On July 23, 1987, Summa sent the stock certificate to Laurins, operating as TPB, at his San Francisco office. Laurins was a customer of a securities firm, Cowles, Sabol & Co. (Cowles), which cleared its securities through Broadcort.[3] Laurins maintained an account for one of his companies, CBG, with Cowles. On July 27, 1987, in an effort to place the 875,000 shares of Summa stock in the hands of his broker (Cowles), Laurins had the stock certificate delivered to Broadcort's office in San Francisco. A stock power executed by Laurins on behalf of Metro and a certificate of corporate resolution executed by the secretary of Metro attesting to Laurins' authority to execute the stock power were delivered with the certificate.[4] Laurins instructed Broadcort to transfer the 875,000 shares of Summa stock represented by the certificate to one of his accounts at Cowles.
 
 
 7
 Meanwhile, stock certificate 21351, with the accompanying stock power and certificate of corporate resolution, was forwarded to Broadcort's New York office and from there to Merrill Lynch. Merrill Lynch attached a form guaranteeing the corporate identity of Metro and affixed stamps guaranteeing the signatures appearing on the stock power and the certificate of corporate resolution. A Merrill Lynch employee also wrote the date July 24, 1987 on the certificate of corporate resolution. In that form the certificate and related documents were negotiable. By guaranteeing the signatures, Merrill Lynch assumed full responsibility for the validity and authority of the signatures and thus eliminated any risk to the transfer agent related to the signatures.[5]
 
 
 8
 Merrill Lynch sent the certificate and transfer documents to Midwest Securities Trust Company (Midwest), a company that handles the physical transfers of Summa stock. After satisfying itself of the negotiability of the certificate and that the transfer documents were complete, Midwest credited Broadcort's account at Merrill Lynch with 875,000 shares of Summa stock.[6] In turn, Broadcort credited Cowles with the same number of shares pursuant to Laurins' instructions. Shortly thereafter, Laurins ordered Cowles to sell 18,750 shares of the stock. The proceeds from these shares were paid to Laurins' account in San Francisco. Laurins also directed the transfer of the remaining 856,250 shares from his account at Cowles to accounts at other brokerage houses in the United States and Canada.
 
 
 9
 Midwest also forwarded the stock certificate to Summa's transfer agent for registration of transfer. A transfer agent is expected to complete such a transfer within seventy-two hours. If the transfer agent considers the transfer documents defective, then the documents are returned for correction to the company that tendered them.
 
 
 10
 Summa's transfer agent received the certificate and accompanying documents from Midwest on August 17, 1987. The certificate was unrestricted, and Summa had not placed a stop transfer order on the certificate at that time. The transfer agent, however, acting pursuant to instructions from Summa's general counsel, first held the shares for two weeks, then ultimately cancelled the shares, refused to register the transfer, and seized the certificate. At the direction of Summa's general counsel, the shares represented by the certificate were reissued to Lincoln Capital to support another loan transaction.
 
 
 11
 Neither Summa nor its transfer agent ever notified Broadcort, Merrill Lynch, or Midwest that they had seized the certificate and reissued the shares to Lincoln Capital. Midwest first learned of the refusal to transfer in October 1987, when it asked Summa's transfer agent why the certificate had not yet been transferred. Summa's transfer agent advised Midwest that the loan for which the certificate had been issued was not consummated. Apparently, this statement was not true because Laurins actually had disbursed substantial loan proceeds to Summa.[7] In any event, Broadcort did not find out until late November 1987 that the registration of transfer had not been completed.
 
 
 12
 Summa claimed that it refused to register transfer of the shares because the shares were to have been held as collateral for a loan to a Summa subsidiary, Scout Petroleum, and the loan was not fully funded. Scout had executed a loan agreement with Laurins' company, TPB, for a $500,000 loan to be secured by the shares. Summa's chairman testified that TPB advanced only $100,000 of the loan amount.
 
 
 13
 At trial, Broadcort demonstrated that the loan, along with the collateral arrangement, was a sham. The loan agreement gave TPB the power to sell the stock immediately. The certificate itself was not restricted in any way. The loan proceeds were derived from sale of the stock. On prior occasions, Summa and a partnership controlled by Summa's chairman had entered into identical "loan" transactions with Laurins' company, CBG, involving 1.7 million shares of Summa stock. The loans were never repaid. After cancellation of the loan for which certificate 21351 was issued, subsidiaries of Summa entered into two other "loans" arranged through Lincoln Capital--the same loan broker that had arranged the Laurins loans. These two loans totalled approximately $2.8 million, for which 1.3 million shares of Summa stock were "pledged." These loans were arranged in the same manner and using the same form agreement as the loans from Laurins' companies.
 
 
 14
 As a result of these loan transactions, the number of shares of Summa common stock outstanding increased by more than seven million shares between March 1987 and the time of trial. This increase occurred even though the Securities and Exchange Commission had not approved a significant registration of Summa common stock since at least 1987. A request by Summa to register additional stock had been pending before the SEC without approval since 1988. At trial, Summa's chairman, a former securities broker, could not find any distinction between the sale of Summa stock pledged as collateral for a defaulted loan and sale of the stock directly into the market by Summa in violation of securities registration requirements.
 
 
 15
 Summa's transfer agent testified that the transfer documents had nothing to do with her refusal to register transfer of the shares at Broadcort's and Midwest's direction. She testified that she would not have registered the transfer if the documents had been in perfect order, or even if Laurins had appeared in person to authorize a transfer, because she knew the shares were related to a loan transaction.
 
 
 16
 As a result of the refusal of Summa's transfer agent to register transfer of the shares, Broadcort's account ended up "short" by 875,000 shares of Summa stock. Broadcort used shares credited by Midwest to its Merrill Lynch account to carry out Laurins' instruction to sell and transfer the shares represented by the certificate. When Summa cancelled the shares represented by the certificate and refused to register the transfer, Midwest debited Broadcort's account for these shares. This left Broadcort with an 875,000 share deficit. Consequently, Broadcort became obligated to its customers to deliver on demand 875,000 more shares of Summa stock than it had on deposit.
 
 
 17
 Broadcort introduced evidence showing that when it is unable to deliver stock, customers have the right to "buy in" the missing stock--that is, to purchase the "short" shares on the open market and charge Broadcort for the cost of the purchase. At the time of trial, Broadcort had been "bought in" to the extent of 18,400 shares of Summa stock at a cost of $38,962.50. Additionally, to protect itself against future "buy ins," Broadcort purchased 87,000 shares of Summa stock in the market. Broadcort purchased these shares at what it believed to be favorable prices at a cost of $172,480. Some of these shares already had been delivered to customers. At the time of trial, Broadcort was still short by 769,600 shares of Summa stock which, when and if demand was made, it would have to purchase in the market. The jury subsequently returned a verdict in favor of Broadcort in the amount of $1,600,000 in compensatory damages and $400,000 in punitive damages.
 
 DISCUSSION
 I.
 
 18
 Summa first asserts that Broadcort failed to prove a prima facie case that Summa breached its statutory duty under New Mexico law to register the transfer of stock certificate 21351 to Broadcort. The duty to register a transfer arises under Article 8 of the New Mexico Uniform Commercial Code. Section 55-8-401 provides:
 
 
 19
 If a certificated security in registered form is presented to the issuer with a request to register transfer or an instruction is presented to the issuer with a request to register transfer, pledge or release, the issuer shall register the transfer, pledge or release as requested if:
 
 
 20
 (a) the security is indorsed or the instruction was originated by the appropriate person or persons (Section 55-8-308 NMSA 1978);
 
 
 21
 (b) reasonable assurance is given that those indorsements or instructions are genuine and effective (Section 55-8-402 NMSA 1978);
 
 
 22
 (c) the issuer has no duty as to adverse claims or has discharged the duty (Section 55-8-403 NMSA 1978);
 
 
 23
 (d) any applicable law relating to the collection of taxes has been complied with; and
 
 
 24
 (e) the transfer, pledge or release is in fact rightful or is to a bona fide purchaser.
 
 
 25
 N.M.Stat.Ann. § 55-8-401(1). The official comment to the section states that "[i]f any of the preconditions do not exist, there is no duty to register transfer." Id. cmt. 3. Summa asserts that Broadcort did not establish a prima facie case because it failed to prove that it was a "purchaser" or that the transfer was "rightful" as required by § 55-8-401(1)(e).
 
 
 26
 To establish a prima facie case, Broadcort must only demonstrate either that it was a bona fide purchaser or that the transfer was in fact "rightful." Pursuant to N.M.Stat.Ann. § 55-8-302, "[a] 'bona fide purchaser' is a purchaser for value in good faith and without notice of any adverse claim ... who takes delivery of a certificated security in bearer form or in registered form issued or indorsed to him in blank." On appeal, Summa does not contest either the form of the transfer or that Broadcort accepted the stock certificate in good faith and without notice of an adverse claim. Instead, Summa argues that Broadcort was not a "purchaser" as defined in Article 8 of New Mexico's Uniform Commercial Code. We disagree and conclude that Broadcort, in this case, does fall into the broadly defined category of a "purchaser."
 
 
 27
 A "purchaser" is defined as "a person who takes by purchase." N.M.Stat.Ann. § 55-1-201(33). A " 'purchase' includes taking by sale, discount, negotiation, mortgage, pledge, lien, issue or reissue, gift or any other voluntary transaction creating an interest in property." Id. § 55-1-201(32) (emphasis added). In this case, when Laurins delivered the stock certificate to Broadcort, he instructed Broadcort to transfer the 875,000 shares to one of his accounts at Cowles. As part of the transaction, the certificate and accompanying transfer documents were forwarded to Merrill Lynch and then to Midwest. After reviewing the certificate and transfer documents, Midwest--pursuant to industry practice--credited Broadcort's account at Merrill Lynch with 875,000 shares of Summa stock. Broadcort then credited 875,000 shares to Cowles, who in turn credited Laurins' account with the shares. By crediting Cowles account before it actually received shares of Summa stock on deposit, Broadcort was left in a "short" position.[8] In other words, Broadcort obligated itself to meet demands for delivery that its other customers might have for shares of Summa stock until the transfer of Summa shares was registered and Broadcort's short position was eliminated. We conclude that by crediting Cowles with 875,000 shares of Summa stock before transfer of the shares was registered, a property interest in the stock certificate was created in Broadcort. Therefore, Broadcort qualifies as a purchaser as contemplated in § 55-8-401(1)(e).
 
 
 28
 Official Comment 5 to § 55-8-304 states that "a bank, stockbroker or other intermediary who, in the particular transaction acts purely in that capacity, is not a purchaser." Summa argues that Broadcort acted purely in the capacity as an intermediary and, thus, cannot be a purchaser. Broadcort, however, by crediting Summa shares to Cowles before it actually received the shares from Midwest, performed more than a purely intermediary function. Therefore, we hold that Broadcort was a purchaser and did not fail to prove a prima facie case under § 55-8-401.
 
 II.
 
 29
 Summa asserts that Broadcort lacked standing to bring this suit because Broadcort could not compel registration of the stock or seek money damages. Section 55-8-401(2) states that "[i]f an issuer is under a duty to register a transfer, pledge or release of a security, the issuer is also liable to the person presenting a certificated security or an instruction for registration or his principal for loss resulting from any unreasonable delay in registration or from failure or refusal to register the transfer, pledge or release." (Emphasis added.) Summa asserts that Broadcort lacks standing under this provision because the certificate was presented for transfer by Midwest and because the "short" position resulting from the seizure of the certificate was created by Midwest against Merrill Lynch's account, not Broadcort's.
 
 
 30
 First, the record demonstrates that Broadcort was a principal of Midwest and, therefore, falls explicitly within the scope of persons that may recover under § 55-8-401(2).[9] According to the evidence presented at trial, Broadcort--and not Midwest--bore the risk that the transfer of certificate 21351 would not be registered by Summa's transfer agent.[10] Therefore, for the limited purpose of submitting the stock certificate to Summa's transfer agent, Midwest acted on Broadcort's behalf. Accordingly, we conclude that Broadcort was Midwest's "principal"--as that term is used in § 55-8-401(2)--with respect to the presentation of stock certificate 21351. See Totah Drilling Co. v. Abraham, 64 N.M. 380, 328 P.2d 1083, 1087 (1958) (agency relationship created where "the principal has in some manner indicated that the agent is to act on his behalf").
 
 
 31
 Second, although the short position was entered against the Merrill Lynch account on Midwest's books, the evidence indicates that Broadcort remains responsible to its customers for delivering the shares of Summa stock because Merrill Lynch debited Broadcort's account for these shares. Indeed, the trial evidence demonstrates that Broadcort, not Merrill Lynch, already has been "bought in" with respect to a portion of the 875,000 shares of Summa stock. Broadcort, not Merrill Lynch, has suffered the injury. Thus, we conclude that Broadcort has standing under section 55-8-401(2).
 
 III.
 
 32
 At the close of all the evidence, the district court dismissed Summa's third-party complaint because Summa had not shown that it relied on the alleged fraud or forgery of Merrill Lynch's employee and, therefore, did not establish a claim for common law fraud under New Mexico law. Summa asserts that, under Citizens Bank v. C & H Construction & Paving Co., Inc., 89 N.M. 360, 552 P.2d 796 (Ct.App.), cert. denied, 90 N.M. 7, 558 P.2d 619 (1976), the district court erred in concluding that Summa had to rely on Merrill Lynch's alleged fraud.[11]
 
 
 33
 Summa claims that a Merrill Lynch employee altered the transfer documents that accompanied the certificate so that the documents would appear proper when presented to Summa's transfer agent. According to Summa, when Broadcort received the stock certificate and corporate resolution, Laurins' account had an "N/N" flag that prohibited him from trading the shares or receiving the proceeds of any sales. This flag remained when the stock certificate was sent to Merrill Lynch to determine the negotiability of the certificate. An employee of Merrill Lynch altered the corporate resolution to make it timely. This resulted in the "N/N" notation being removed from Laurins' account and allowed the stock certificate to be placed into the stream of commerce. In reliance on the actions taken by Merrill Lynch, Midwest gave Merrill Lynch an immediate credit of 875,000 shares of Summa stock, and Midwest presented the certificate to Summa's transfer agent for registration.
 
 
 34
 It is undisputed that Summa's transfer agent did not rely on the actions of the Merrill Lynch employee. The transfer agent testified that regardless of what Merrill Lynch did or did not do, she still would not have registered the transfer of the certificate. The district court found that an action for fraud could not be maintained because there was no reliance on the part of Summa.
 
 
 35
 In Citizens Bank, a bank brought an action against a corporation and some of its officers. The noncorporate defendants filed counterclaims based on an alleged fraud by the bank in connection with some loan proceedings. The bank defended this counterclaim, in part, on the ground that one of the defendants--James C. Davis--could not recover because he did not rely on the false representations made by the bank. Id. 552 P.2d at 801. The New Mexico Court of Appeals rejected this argument. The court stated that "under the facts of this case, it was not necessary for James C. Davis to rely on the false representations of Citizens Bank." The court based this statement on two principles. First, quoting a Colorado appellate court, it stated that " '[a] representation, to be the basis of a fraud and deceit action, need not, in all cases, be made to the party seeking recovery. [Citations omitted]. It is necessary only that the plaintiff be in the class of persons that the defendant intended to influence.' " Id. at 801-02 (quoting Mead & Mount Constr. Co. v. Fox Metal Indus., Inc., 511 P.2d 509, 510 (Colo.App.1973)). Second, the court stated that " '[t]he right to recover for deceit should not be restricted to the immediate parties making the contract. If a third party is injured by the deceit, he should be allowed to recover against the one who made possible the damages to him by practicing the deceit in the first place.' " Id. at 802 (quoting Highland Motor Transfer Co. v. Heyburn Bldg. Co., 237 Ky. 337, 35 S.W.2d 521, 523-24 (1931)). Finally, the court explained that "[t]hese concepts state a broad rule which protects an innocent person from the intentional fraud of another." Id. Thus, under New Mexico law, an innocent person can recover for fraud--even though they did not rely on the fraud--as long as someone relied and the plaintiff is within the class of persons that the defrauder intended to influence.
 
 
 36
 After reviewing the record, we conclude that Summa's third-party complaint was correctly dismissed under Citizens Bank. We base our conclusion on different grounds than the district court. First, Summa has not demonstrated that they are "innocent" in this transaction. Indeed, the record reveals evidence quite to the contrary. Second, Summa made no showing that Merrill Lynch's alleged fraudulent activity was made for the purpose of influencing Summa. Third, the uncontroverted testimony was that Summa was not directly injured by the actions of Merrill Lynch; Summa's transfer agent would have refused to recognize the transfer regardless of whether the notation appeared. Summa also suggests that it was indirectly injured because Merrill Lynch's actions facilitated the transfer of the shares by Laurins into the stream of commerce. However, the record clearly demonstrates that this is exactly what Summa expected--or at least suspected--would happen. Summa placed no restrictive legend on the stock certificate it transferred to TPB. Moreover, Summa had entered into similar loan transactions with an understanding that Laurins could sell Summa shares and place them in the stream of commerce. Summa cannot now claim injury for actions of Merrill Lynch that did no more than further Summa's intent and understanding of what would result from its loan transactions with Laurins and his companies.
 
 
 37
 These facts stand in stark contrast to the facts of Citizens Bank where the injured party was innocent, the defrauder intended to influence the injured party, and the injured party did in fact suffer harm. Therefore, we conclude that Summa failed to establish a claim for fraud and that the district court correctly dismissed Summa's third-party complaint against Merrill Lynch.
 
 IV.
 
 38
 Summa argues that the district court erred by submitting the conversion claim to the jury.[12] The jury concluded that Summa was liable for conversion when it failed to register the transfer. Summa's argument contains two parts: first, it argues that the exclusive remedy for failure to register is the issuance of securities or money damages to purchase the securities under section 55-8-104; second, it asserts that Broadcort could not establish an action for conversion because it did not own the certificate. Neither of these arguments is persuasive.
 
 
 39
 First, the UCC drafters intended that general principles of law supplement the Code's provisions. See N.M.Stat.Ann. § 55-1-103 cmt. 1 ("[T]his section indicates the continued applicability to commercial contracts of all supplemental bodies of law except insofar as they are explicitly displaced by this act."); see also New Jersey Bank, N.A. v. Bradford Sec. Operations, Inc., 690 F.2d 339, 346 (3d Cir.1982) ("[t]he UCC does not displace the common law of tort as it affects the parties in their commercial dealings except insofar as reliance on the common law would thwart the purposes of the Code"); Morgan Guar. Trust Co. v. Third Nat'l Bank, 400 F.Supp. 383, 388 (D.Mass.1975) ("Suits in conversion, a common law tort, are not specifically provided for in Article 8. Yet the Code's authors envisioned that such suits would be brought."), aff'd, 529 F.2d 1141 (1st Cir.1976). In light of the intent of the drafters of the UCC, we are convinced that the Supreme Court of New Mexico would not foreclose an action for conversion where a plaintiff also sues under § 55-8-401. Summa also asserts that Broadcort's exclusive remedy was to compel transfer of the stock. Because we conclude, viewing the evidence in the light most favorable to Broadcort, that Summa committed an act of conversion, monetary damages are clearly appropriate. See Frank Bond & Son, Inc. v. Reserve Minerals Corp., 65 N.M. 257, 335 P.2d 858 (1959). Thus, Broadcort's remedies are not limited to a compelled transfer of stock.
 
 
 40
 Second, Broadcort established the elements of conversion. Under New Mexico law, an action for conversion arises "if at the time of conversion, plaintiff had ownership of the chattel or had the right to possession thereof." Aragon v. General Elec. Credit Corp., 89 N.M. 723, 557 P.2d 572, 574 (Ct.App.), cert. denied, 90 N.M. 7, 558 P.2d 619 (1976). We already have concluded that Broadcort had a property interest in stock certificate 21351 when it credited Cowles with 875,000 shares of Summa stock before the transfer was registered. Further, the evidence, taken in the light most favorable to Broadcort, reveals that Broadcort had a right to possession. Broadcort established that Summa had an obligation to either register transfer or return the certificate for the correction of defects. When Summa refused to transfer, Broadcort had a right to possess the certificate. Summa refused to return the certificate and thus committed an act of conversion.
 
 V.
 
 41
 Summa contends that the damage award was excessive in that the jury awarded Broadcort $1,600,000 in actual damages. Summa asserts that Broadcort should only be able to recover monetary damages based on the value of stock as of the date Summa refused to register the transfer. See Loretto Literary & Benevolent Inst. v. Blue Diamond Coal Co., 444 A.2d 256, 259 (Del.Ch.1982). However, in Frank Bond & Son, 335 P.2d at 861, the New Mexico Supreme Court stated that the measure of damages for conversion includes the "value of the subject matter ... at the time and place of the conversion ... or a different value where that is necessary to give just compensation." Viewing the evidence in the light most favorable to the verdict, Broadcort established that just compensation is the cost Broadcort will incur in replacing the shares that it is obligated to furnish its customers.
 
 
 42
 Summa also argues that Broadcort failed to properly mitigate its damages because it did not purchase replacement stock when the Summa shares were at their lowest value. The jury verdict demonstrates that it found that Broadcort acted reasonably in mitigating its damages,[13] and the evidence clearly supports this conclusion. First, although it is easy to ascertain the lowest price of a stock in hindsight, it is very difficult to do so at the time one intends to buy stock. Second, if Broadcort had gone into the market and purchased large blocks of Summa stock, the price almost certainly would have gone up. Third, Broadcort remained out of the market in 1987 in order to avoid the need to make any purchase at all in hopes that a settlement with Summa could be reached. Therefore, we conclude that the jury's award is supported by substantial evidence and that Broadcort did not fail to mitigate its damages.
 
 VI.
 
 43
 The district court allowed Broadcort to submit a claim for punitive damages to the jury. Summa contends that the district court erred because the UCC does not allow the recovery of punitive damages for a failure to register a transfer of a stock certificate. Because we already have concluded that Broadcort stated a claim for conversion and because punitive damages can be appropriate in an action for conversion, we do not address this argument. Second, Summa asserts that even if the district court properly submitted the conversion claim to the jury, the evidence was insufficient as a matter of law to support an award of punitive damages.
 
 
 44
 After reviewing the evidence, we conclude that the jury reasonably could have inferred that Summa was aware, and probably intended, that Metro would transfer the shares represented by certificate 21351. This view coincides with a pattern of prior and subsequent transactions in which Summa or a subsidiary of Summa used shares of Summa stock as collateral to obtain loans from Laurins or another lender. Further, Summa placed no restrictive legend on the certificate and did nothing to warn transferees that it would not register the transfer of the shares. From this evidence, which suggests that Summa knew that certificate 21351 would or could end up in the hands of a third party transferee, the jury could have inferred that Summa acted with willful indifference and conscious disregard for Broadcort's rights and intended to commit a fraudulent act. See Aragon, 557 P.2d at 575 (punitive damages appropriate in connection with a conversion where defendant insurance company acted in bad faith by refusing to pay plaintiff in accordance with terms of insurance contract). Thus, the record reveals sufficient evidence to support an award of punitive damages.
 
 
 45
 Summa also asserts that the punitive damages award was excessive because the jury instructions did not contain adequate safeguards and standards by which the jury properly could consider whether to award punitive damages and, if so, in what amount. In Mason v. Texaco, Inc., 948 F.2d 1546 (10th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992), we held that an award of $25,000,000 in punitive damages shocked our judicial conscience. Id. at 1561. In Pacific Mutual Life Insurance Company v. Haslip, --- U.S. ----, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the Supreme Court held that a punitive damages award--an award that was more than four times the amount of compensatory damages--did not cross the line into the area of constitutional impropriety. Id. --- U.S. at ----, 112 S.Ct. at 1046. Here, the jury awarded punitive damages in the amount of $400,000 damages--only one quarter the amount of the award of compensatory damages. Further, the jury instructions satisfied Summa's interest in rational decision making and ensured that the jury's discretion would be exercised within reasonable constraints.[14] Id. --- U.S. at ----, 112 S.Ct. at 1044. Thus, after reviewing the record and the jury instructions in this case, we conclude that this award does not "jar one's constitutional sensibilities" and was not entered in violation of due process principles. Id. --- U.S. at ----, 112 S.Ct. at 1043.
 
 VII.
 
 46
 Summa next contends that the district court erred in admitting evidence of settlement discussions that involved a different dispute.[15] During the trial, Broadcort questioned Laurins' brother, Zigards Laurins, concerning the settlement discussions of a different claim related to a prior loan transaction in which shares of Summa stock served as collateral. Zigards Laurins testified that Summa's president and chairman of the board, Francisco Urrea, Jr., admitted to him that Laurins' companies had a contractual right to sell the stock before any default on the loans. Broadcort subsequently cross-examined Urrea. Over Summa's objection, Urrea testified that, during his settlement conversations with Zigards Laurins, he suspected that the collateralized stock was sold, but did not know for sure until 1988.
 
 Fed.R.Evid. 408 provides that
 
 47
 [e]vidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.... This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.
 
 
 48
 Rule 408 only bars admission of evidence relating to settlement discussions if that evidence is offered to prove "liability for or invalidity of the claim or its amount." Here, the evidence related to an entirely different claim--the evidence was not admitted to prove the validity or amount of the "claim under negotiation." Vulcan Hart Corp. v. NLRB, 718 F.2d 269, 277 (8th Cir.1983); see also 2 Jack Weinstein & Margaret Berger, Weinstein's Evidence p 408, at 408-32 to 33 (1991) ("Where the settlement negotiations and terms explain and are a part of another dispute they must often be admitted if the trier is to understand the case."). Thus, Rule 408 did not bar this evidence because it related to settlement discussions that involved a different claim than the one at issue in the current trial.[16]
 
 VIII.
 
 49
 Summa claims that the district court abused its discretion in refusing to allow one of its witnesses to testify as an expert. The district court found that the witness was not sufficiently qualified to testify as an expert. We review the district court's decision to exclude expert testimony under an abuse of discretion standard. Quinton v. Farmland Indus., Inc., 928 F.2d 335, 336 (10th Cir.1991).
 
 
 50
 Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Summa contends that its witness was qualified to render opinions by virtue of his knowledge, training, and education. It asserts that the lack of actual experience in representing a transfer agent or a major clearing house would be something for the jury to consider in evaluating the weight of his testimony.
 
 
 51
 After reviewing the record, we cannot conclude that the district court abused its discretion. Although the witness had some education and training in the field, he admitted that he had no experience whatsoever in representing large brokerage houses, clearing corporations, or transfer agents. The district court concluded that the witness mainly had the type of experience that any attorney would receive representing clients in the area of securities law. The district court found that this general experience and education did not qualify the witness as an expert in the securities area. Given the record in this case, the district court's finding was not an abuse of discretion.
 
 
 52
 AFFIRMED.
 
 
 
 *
 The Honorable Dee V. Benson, District Judge for the United States District Court for the District of Utah, sitting by designation
 
 
 [1]
 We draw "all reasonable inferences and resolv[e] all factual conflicts in accord with support for the verdict[ ]." Gardner v. General Motors Corp., 507 F.2d 525, 527 (10th Cir.1974); see also Fox Motors, Inc. v. Mazda Distrib. (Gulf), Inc., 806 F.2d 953, 955 (10th Cir.1986) ("In reviewing a judgment on a jury verdict, the evidence presented at trial must be considered in the light most favorable to the prevailing party.")
 
 
 [2]
 Laurins operated through a number of companies including Metro, CBG Shares Trust (CBG) and TPB Shares Trust (TPB)
 
 
 [3]
 Broadcort describes itself as a securities clearing firm. It provides services to brokers by taking custody of cash and securities tendered by customers, handling transfers of securities, keeping records, maintaining cash accounts, paying customers for securities sold, and performing other securities processing functions. Broadcort is a subsidiary of Merrill Lynch, and its operations are handled through Merrill Lynch, which maintains an account for Broadcort
 
 
 [4]
 The certificate of corporate resolution contained a typographical error in that it was dated December 24, 1985--a year before the meeting of Metro directors, which occurred on December 24, 1986
 
 
 [5]
 The record indicates that in the securities industry, transfer agents commonly rely upon signature guarantees given by entities such as Merrill Lynch
 
 
 [6]
 Significantly, this credit to Broadcort's account occurred--according to industry practice--even though Summa's transfer agent had not yet registered the transfer the transfer. Indeed, Summa's transfer agent never did register the transfer
 
 
 [7]
 Summa's transfer agent, Mary Fernandez, testified that Summa's general counsel gave her conflicting reasons for placing a stop transfer order on the certificate. Fernandez stated that on one occasion she was told that the loan for which the stock certificate served as collateral had been paid off; on another occasion, Fernandez was told that the loan had been cancelled
 
 
 [8]
 Summa suggests that Broadcort's short position arose from actions subsequent to the transfer of the stock certificate to Broadcort. However, these subsequent events cannot be separated from Laurins' transfer of the certificate to Broadcort. Laurins' purpose in transferring the certificate was to receive credit in his account at Cowles so that he could sell or transfer the 875,000 shares of Summa stock. Therefore, the transfer transaction did not culminate until Broadcort credited Cowles with the 875,000 shares. At that point, Broadcort had already taken the short position and became obligated to meet demands of other customers who requested delivery of the shares that Broadcort had credited to Cowles
 
 
 [9]
 Section 55-8-401(2) provides that
 [i]f an issuer is under a duty to register a transfer, pledge or release of a security, the issuer is also liable to the person presenting a certificated security or an instruction for registration or his principal for loss resulting from any unreasonable delay in registration or from failure or refusal to register the transfer, pledge or release.
 
 
 [10]
 Louis Viola, vice-president of securities operations at Midwest, testified that when a transfer agent refuses to register a transfer and returns a certificated security to Midwest, Midwest--as a normal practice--"return[s] the securities and documents to the participant after we have charged their account."
 
 
 [11]
 We review the district court's directed verdict de novo. We construe the evidence in favor of Summa to determine whether "the evidence points but one way and is susceptible to no reasonable inferences supporting [Summa]." Zimmerman v. First Fed. Sav. & Loan Ass'n, 848 F.2d 1047, 1051 (10th Cir.1988)
 
 
 [12]
 We again apply a de novo standard of review to the district court's denial of a motion for a directed verdict. Because Summa moved for directed verdict, we construe the evidence in the light most favorable to Broadcort
 
 
 [13]
 The district court instructed the jury to consider that "an injured person must exercise ordinary care to minimize or lessen his damages."
 
 
 [14]
 Jury instruction number 16 stated:
 In the event you find that Broadcort should recover either actual or nominal damages, and if you find that Broadcort has proven by a preponderance of the evidence that the acts of Summa were willful, wanton, or malicious then you may award exemplary or punitive damages.
 Such additional damages are awarded for the limited purposes of punishment and to deter others from the commission of like offenses.
 The amount of exemplary damages or punitive damages must be based on reason and justice taking into account all the circumstances, including the nature of the wrong and such aggravating and mitigating circumstances as may be shown. The amount awarded, if any, must be reasonably related to the actual damages and injury and not disproportionate to the circumstances.
 
 
 [15]
 We review the trial court's admission or exclusion of evidence under an abuse of discretion standard. United States v. Alexander, 849 F.2d 1293, 1301 (10th Cir.1988)
 
 
 [16]
 We also note that even if Rule 408 applied to the evidence relating to these settlement discussions the evidence here would still be admissible because it was offered to show the workings of Summa's loan scheme. The evidence was not admitted to show liability for the claim or its amount. See Bradbury v. Phillips Petroleum Co., 815 F.2d 1356, 1363-66 (10th Cir.1987); Wegerer v. First Commodity Corp. of Boston, 744 F.2d 719, 723-24 (10th Cir.1984)