**Cheryl Emily GRAVES and Dan Graves, Plaintiffs,**

v.

**MAZDA MOTOR CORPORATION, Defendant.**

Case No. CIV–08–0035–F.

United States District Court, W.D. Oklahoma.

Dec. 17, 2009.

See also 598 F.Supp.2d 1216.

Amy K. Witherite, Brian A. Eberstein, Eberstein & Witherite LLP, Eric T. Tracy, The Tracy Firm, Dallas, TX, Paul D. Kouri, Rex K. Travis, Travis Law Office, Henry A. Meyer, III, Meyer & Leonard PLLC, Oklahoma City, OK, for Plaintiffs.

Daniel D. Draper, III, Draper Law Firm, Owasso, OK, David L. Ayers, Jennifer A. Rogers, Watkins & Eager PLLC, Jackson, MS, for Defendant.

### MEMORANDUM OPINION AND ORDER

STEPHEN P. FRIOT, District Judge.

The following motions are pending in this action:

Doc. no. 70: Motion of Mazda Motor Corporation to Exclude the Testimony and Opinions of Stephen R. Syson;

Doc. no. 73: Defendant's Motion *In Limine* Seeking to Limit Plaintiffs' Expert's Testimony and/or His Reliance On, Or Utilization of, Any Exhibits Not Contained in His Rule 26 Report;

Doc. no. 74: Defendant's Motion for Summary Judgment;

Doc no. 75: Plaintiffs' Motion *In Limine* to Preclude Keisuke Miyoshi from Testifying;

Doc. no. 76: Plaintiffs' Motion to Exclude Duplicative Expert Testimony;

Doc. no. 77: Plaintiff's Notice of Plaintiffs' Motion to Limit the Testimony of James Schultz, One of Defendant's Experts; and,

Doc. no. 91: Motion of Defendant Mazda Motor Corporation to Strike Portions of the March 30, 2009 Affidavit of Stephen Syson.

All of these motions are fully briefed and are at issue. This order addresses defendant's Daubert motion to exclude the testimony of Stephen R. Syson (doc. no. 70) and the motion for summary judgment (doc. no. 74). In this order, the court grants the Daubert motion, which results, in turn, in the granting of the motion for summary judgment. This disposition of the Daubert and summary judgment motions renders the other pending motions moot.

1. The papers supporting and opposing the motions now before the court encompass twenty separate filings. For the sake of brevity, the parties' papers will generally be referred to by document number, with a reference to the filing party when that is needed for clarity.

2. LCvR56.1 (c) states as follows:
 "The brief in opposition to a motion for summary judgment (or partial summary judgment) shall begin with a section which contains a concise statement of material facts to which the party asserts genuine issues of fact exist. Each fact in dispute shall be numbered, shall refer with particularity to those portions of the record upon which the opposing party relies and, if applicable, shall state the number of the movant's facts that is disputed. All material facts set forth in the statement of the material facts of the movant may be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of material facts of the opposing party."
 Plaintiffs' response to Mazda's motion for summary judgment does not "begin with a

## I. Introduction.

This automotive product liability case, governed substantively by Mississippi law, arises from an accident that occurred in Hattiesburg, Mississippi, on February 11, 2007, in which the plaintiff, Cheryl Graves, sustained serious and permanent injuries. Defendants assert, and plaintiffs do not contest, that plaintiffs do not have a submissible product liability claim unless they have marshaled admissible expert testimony in support of that claim. *See,* doc. no. 74 [1] (defendant) at 14–15; doc. no. 83 (plaintiff) at 11–24. The court agrees. Consequently, the submissibility of plaintiffs' claim depends on whether they can satisfy their burden of establishing the admissibility of the proposed expert testimony of their liability expert, Stephen R. Syson.

## II. Factual background.[2]

The plaintiffs are Cheryl Graves and her husband, Don Graves, residents of Okla-

section which contains a concise statement of material facts to which the party asserts genuine issues of fact exist." Instead, the factual portion of plaintiffs' response contains plaintiffs' exposition of the facts, with only a few passing references to disputed factual matters. Specifically, plaintiffs dispute: (i) that a majority of automotive manufacturers use non-linear gated shifters in one or more of their vehicles, and (ii) that the automobile involved in this case had a shifter that was substantially similar to the shifters in plaintiffs' personal automobiles. *See,* doc. no. 74 (defendant) at 6; doc. no. 83 (plaintiffs), at 5–6. Accordingly, these factual contentions by defendant are disregarded. In all other respects, defendant's 28–paragraph statement of facts is uncontroverted and is consequently taken as true. *See, e.g. Bennett v. Fuller,* 2008 WL 2987173, at *3 (N.D.Okla.2008) (applying Northern District version of LCvR56.1). Although, with the exceptions noted, all of the facts in defendant's statement are taken as true, the facts which are dispositive are the facts set forth herein.

homa. The accident involved in this case occurred on February 11, 2007. Two days before the accident, Cheryl Graves traveled by air to Mississippi, arriving at the Hattiesburg–Laurel Regional Airport on February 9. Upon arrival at the airport, Ms. Graves rented a 2006 Mazda automobile, a "Mazda6" (the Mazda6). While in Mississippi, Ms. Graves operated the Mazda6 without mishap until her return trip to the airport on February 11. On that trip, she pulled into the driveway of a private residence to ask for directions. After she got out of the car, the car hit her, knocking her down and injuring her seriously.

Plaintiffs initially filed suit against Mazda in this court in April, 2007. They voluntarily dismissed that case shortly after it was filed, and before a responsive pleading was filed. The instant case was filed on January 11, 2008.

As will be seen, there has been some give and take between plaintiffs and their liability expert, Mr. Syson, as to the facts of this case. Those differences, which have now narrowed somewhat, are ultimately of little consequence to the court's resolution of the issues presented by the pending motions. However, because a clear understanding of plaintiffs' contentions as to the physical facts is essential to an evaluation of the proposed expert testimony of Mr. Syson under Rule 702 and *Daubert*, plaintiffs' factual contentions and Mr. Syson's related factual assumptions should be examined.

Preliminarily, some facts as to the Mazda automobile involved in this case should be understood.

The Mazda6 had an automatic transmission. The shifter was located slightly forward of the driver's seat. Doc. no. 74–9, 74–10 and 74–16 (exhs. 8, 9 and 15 to motion for summary judgment). The shift lever was of the type that must be moved laterally to enable it to be moved back and forth from one gear to another, or into the "park" position (herein: "gated shifter"). *Id.* Some other automobiles have shifters that move back and forth in a straight line, without having to be moved laterally (herein: "straight shifter"). Doc. no. 74–16, p. 10 (Syson report). Ms. Graves' personal vehicle, a Lexus LS400, had a gated shifter, as did her husband's personal vehicle, a Toyota Avalon. Doc. no. 74, p. 6, ¶ 11 and 74–12, 74–13 (photographs of shifters on the Lexus and the Toyota—exhs. 11 and 12 to motion for summary judgment).[3]

In their complaint, plaintiffs allege that, after stopping to ask for directions, Ms. Graves "put the car in park and left the engine running." Complaint, doc. no. 1, at ¶ 6. She then asserts that "after stepping out of the vehicle, she was struck by the vehicle, which apparently had shifted into reverse." *Id.* Accordingly, plaintiffs allege that the Mazda6 was defective because:

"a. the vehicle is prone to experiencing a false park;

b. the vehicle is prone to shifting out of gear while the vehicle is running;

c. the vehicle is prone to not having its shift lever engage fully into the park position."

*Id.* at ¶ 9.

Ms. Graves' answers to interrogatories, dated July 25, 2008 (joined in by Mr. Graves), state that "I put the car in park and opened the driver side door. I stepped out. At that moment as I was turning to go to the house, the car door

---

**3.** The similarities between the shifters on the Mazda6 and on plaintiffs' personal vehicles are dispositive of nothing but nevertheless worthy of note, given the nature of plaintiffs' theory of causation and defect. Although it is uncontroverted that the Mazda6 and both of the plaintiffs' personal cars had gated shifters, plaintiffs deny that the shifter on the Mazda6 was substantially similar to the shifters on their personal cars. Doc. no. 83 (plaintiffs) at 6.

struck me and knocked me down." Doc. no. 74–3, at 11.

At her deposition, Ms. Graves testified that:

"A. I shifted it into park. I shifted it up and into park.

Q. Did you shift it up and over and back around into park?

A. As far as I can remember I did, yes."

Doc. no. 74–14 (depo. p. 138).

Mr. Syson, in contrast, states that: "However, based on the totality of the evidence, the shift lever could not have been placed from drive up into park." Syson Aff., ¶ 49, doc. no. 83–2. The conflict between Ms. Graves' testimony and her expert's categorical statement to the contrary is of no moment to the court's resolution of the motions before it.

After Mazda filed its Daubert motion and motion for summary judgment, Ms. Graves and Mr. Syson asserted that Ms. Graves placed the shifter *between* park and reverse. The evolution of Ms. Graves' and Mr. Syson's factual contentions is shown in the following chart:

| | Ms. Graves | Mr. Syson |
|---|---|---|
| Ms. Graves put the shifter in park. | Complaint (1/11/08), ¶ 6 [4] <br> Ans. to Interrogatory No. 7 (7/25/08) [5] <br> Deposition (10/13/08), p. 138 [6] | |
| Ms. Graves put the shifter in reverse. | | Report dated 1/20/09, ¶ VII(G) [7] |
| Ms. Graves put the shifter between park and reverse. | Affidavit dated 3/27/09, ¶¶ 5, 6 [8] <br> Plaintiffs' summary judgment response (3/30/09), ¶¶ 33, 51 [9] <br> Plaintiffs' Daubert response (3/30/09), ¶ 35 [10] | Affidavit dated 3/30/09, ¶¶ 37, 51 [11] |

Thus, Ms. Graves, but not Mr. Syson, has asserted that Ms. Graves put the shifter in the park position. Mr. Syson, but not Ms. Graves, has asserted that Ms. Graves put the shifter in reverse. Ultimately, they both asserted that Ms. Graves put the shifter between park and reverse—Ms. Graves so testifies (in her affidavit) and Mr. Syson so assumes.[12]

4. Doc. no. 1.

5. Doc. no. 74–3.

6. Doc. no. 74–14.

7. Doc. no. 74–16.

8. Doc. no. 83–5.

9. Doc. no. 83.

10. Doc. no. 82.

11. Doc. no. 83–2.

12. Because Ms. Graves' present assertion that the shifter was positioned between park and reverse directly contradicts her testimony in her deposition and in her answers to interrogatories, it is tempting to criticize Mr. Syson's assumption that the shifter was positioned between park and reverse as being without a reasonable factual foundation. However, this theory, set forth for the first time in Mr. Syson's March 30, 2009 affidavit, is supported by Ms. Graves' March 27, 2009 affidavit, even though it is controverted by her answers to interrogatories and by her deposition testimony. For present purposes, it is sufficient to observe that an expert is, at least within the outer bounds of reason, permitted to accept his principal's version of foundational facts as to which some uncertainty may legitimately exist. Accordingly, the court declines to criticize Mr. Syson's proposed testimony on this basis.

Mazda filed its Daubert motion and motion for summary judgment on March 10, 2009, after Mr. Syson rendered his Rule 26 report. Plaintiffs responded with briefs and with affidavits from Ms. Graves and Mr. Syson. Mazda's motion for summary judgment is entirely predicated on the asserted insufficiency of Mr. Syson's proposed expert testimony. The motion for summary judgment thus cannot be granted if the Daubert motion is denied. Accordingly, the court addresses the Daubert motion first.

### III. *Mississippi Products Liability Law.*

The Daubert motion and the motion for summary judgment should both be considered against the backdrop of Mississippi products liability law.[13] The basic framework for Mississippi products liability law is set forth in the Mississippi Products Liability Act, Miss.Code Ann. § 11–1–63. *See,* generally, *Williams v. Bennett,* 921 So.2d 1269, 1273–75 (Miss.2006). As relevant here, the Mississippi statute which governs product liability claims provides as follows:

**§ 11–1–63. Product liability suits**

Subject to the provisions of Section 11–1–64, in any action for damages caused by a product except for commercial damage to the product itself:

(a) The manufacturer or seller of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:

(i) 1. The product was defective because it deviated in a material way from the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturing specifications, or

2. The product was defective because it failed to contain adequate warnings or instructions, or

3. The product was designed in a defective manner, or

4. The product breached an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product; and

(ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and

(iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

\* \* \*

(f) In any action alleging that a product is defective because of its design pursuant to paragraph (a)(i)3 of this section, the manufacturer or product seller shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:

(i) The manufacturer or seller knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger that caused the damage for which recovery is sought; and

(ii) The product failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability prevented the harm. A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, useful-

---

**13.** By order entered on February 26, 2009, doc. no. 68, the court determined that the substantive law of the State of Mississippi controls in this case.

ness, practicality or desirability of the product to users or consumers.

As can be seen, Mississippi's statutory provision begins with the familiar elements of product liability: Plaintiff must show a defect, the defect must render the product unreasonably dangerous to the user or consumer, and the defective and unreasonably dangerous condition of the product must have proximately caused the plaintiff's damages.

Additional statutory requirements apply in design defect cases. "Importantly, the above cited section requires a claimant in a design defect case to prove three additional elements." *Williams*, 921 So.2d at 1274. Those additional elements are spelled out in subsection (f) of § 11–1–63, which requires that a plaintiff in a design defect case also establish that (i) the manufacturer knew or should have known about the danger that caused the damage, (ii) the product failed to function as expected, and (iii) "there existed a feasible design alternative that would have to a reasonable probability prevented the harm." Miss. Code Ann. § 11–1–63(f). Moreover, the proposed "feasible design alternative" must be a "design that would have to a reasonable probability [a] prevented the harm [b] without impairing the utility, usefulness, practicality or desirability of the product to users or consumers." § 11–1–63(f)(ii). Thus, the focus of the first prong of the statutory test for a "feasible design alternative" is case-specific ("would have ... prevented the harm"); the second prong focuses on "users or consumers" in general. Plainly, both prongs must be satisfied. *Johnson v. Davidson Ladders, Inc.*, 403 F.Supp.2d 544, 550 (N.D.Miss.

2005) (analyzing both the risk avoided and the utility of the proposed alternative).

Proof of a feasible design alternative does not constitute, and is not a substitute for, proof that the product is defective and unreasonably dangerous. The statutory scheme makes clear, as does the case law, *Williams*, 921 So.2d at 1273, that proof that the product is defective, that it is unreasonably dangerous, and that the defective and unreasonably dangerous condition proximately caused the plaintiff's damages (all under subsection (a) of the statute) are *antecedent to* the additional requirement, in design defect cases (under subsection (f)), that the plaintiff prove a feasible design alternative which satisfies the additional statutory requirements.

Highly relevant to the determination of whether a proposed "feasible design alternative" satisfies the requirements of § 11–1–63(f)(ii) is the question of whether the proposed alternative would have been "likely to fail and result in accidents...." *Williams*, 921 So.2d at 1276, quoting from *Wolf v. Stanley Works*, 757 So.2d 316, 322 (Miss.Ct.App.2000). If the proposed design alternative is "likely to fail and result in accidents," then that characteristic would "impair the 'utility, usefulness, practicality or desirability of the product to users or consumers.'" *Id.* Again, it is important to note, in light of Mr. Syson's contentions in the case at bar, that, in assessing whether the proposed design alternative is likely to result in accidents, thus impairing its "utility, usefulness, practicality or desirability," the statutory reference point is "users or consumers," rather than the plaintiff who asserts the claim. In short, the idiosyncrasies of any particular plaintiff are not determinative of whether the proposed design alternative satisfies the second prong of the statutory test.[14] Under Mis-

14. The court's examination of Mississippi law also leads quite readily to the conclusion (as asserted by defendant, doc. no. 74, at 14–15, and not contested by plaintiff) that, in a design defect case, at least a case involving a mechanism as sophisticated as the shifter mechanism in an automobile, the plaintiff's claim will fail as a matter of law if the expert testimony proffered by the plaintiff on the

sissippi products liability law, the defect exists, or not, "at the time the product left the control of the manufacturer or seller." Miss.Code Ann. § 11–1–63(a). Although the first prong of the test of a feasible design alternative ("would have ... prevented the harm") may well hinge on the plaintiff's interaction with the product, the second prong focuses on the product, not the plaintiff.

## IV. The Daubert Motion.

### A. The general framework for Daubert analysis in this case.

The basic principles which govern the resolution of a challenge to the admissibility of proposed expert testimony are nearly rote, but bear repeating with an eye to the context of the issues now before the court. Those principles are discussed in broad terms at this point. Further, more specific, discussion and analysis will be found later in this memorandum opinion.

The Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) establish a "gatekeeper" function for trial judges under Rule 702, Fed.R.Evid. *See also, Goebel v. Denver and Rio Grande Western R. Co.*, 215 F.3d 1083 at 1087 (10th Cir.2000) (*Goebel I* ). The gatekeeper function "requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is scientifically valid and applicable to a particular set of facts." *Id.*

The question of *how* to perform its gatekeeping function is a discretionary matter for the trial court. The court may conduct a hearing, it may perform its gatekeeping obligation by ruling on a motion in limine or on an objection at trial, or even by ruling on a post-trial motion.[15] *Id.* When faced with a Daubert objection to proposed expert testimony, the court must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper. *Goebel I*, 215 F.3d at 1088. The Court of Appeals has left no room for doubt on this point, *e.g., Dodge v. Cotter Corp.*, 328 F.3d 1212, 1227 (10th Cir.2003), *cert. denied*, 540 U.S. 1003, 124 S.Ct. 533, 157 L.Ed.2d 408 (2003) ("Again, we lack specific, detailed findings about [the expert's] reasoning or the reliability of his methodology in arriving at his conclusions.").

When the proposed testimony of an expert is challenged under *Daubert* and its progeny, Rule 104 of the Federal Rules of Evidence applies to the court's consider-

design defect issues is fatally deficient under *Daubert* and *Kumho* and their progeny. *See, e.g., Watkins v. Telsmith, Inc.*, 121 F.3d 984, 993 (5th Cir.1997) (applying Mississippi law).

**15.** In their response to the Daubert motion, plaintiffs requested "full gatekeeper proceedings" in the event that the court is inclined to grant the motion. Doc. no. 82, at 20. Consequently, shortly after that response was filed, the court entered an order directing the plaintiffs to file "a concise summary of the presentation they would intend to make, with special attention to matters not adequately covered in the papers now before the court, in a hearing on the instant motion." Doc. no. 87. In plaintiffs' response to the order, they said that they made their conditional request for a hearing so that the court could "ask clarifying questions directly to counsel (or Mr. Syson)." Doc. no. 89, at 2. They added that they "have no additional briefing arguments or exhibits they would offer during any gatekeeper hearing pertaining to Mr. Syson." *Id.* at 3. Mr. Syson has stated under oath that "my expert report is very thorough and detailed and provides an excellent roadmap as to my opinions in this case." Doc. no. 83–2, at 5 (Syson affidavit). For these reasons, and because the Daubert motion has been thoroughly briefed, the court concludes quite readily that the issues presented by the Daubert motion can and should be addressed without a hearing.

ation and determination of the issues raised by the Daubert challenge. *Daubert,* at 592, n. 10, 113 S.Ct. 2786. Rule 104(a) casts upon the proponent of the testimony the burden of establishing the admissibility of the testimony by a preponderance of the evidence. *Id. See also, Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 970, n. 4 (10th Cir.2001) and the Advisory Committee notes to the 2000 Amendment to Rule 702 ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."). It is in that light, and with that burden in mind,[16] that the court considers the pending Daubert motions.

Even though the court may delve deeply into the minutiae of the proposed expert's opinions while conducting the Daubert analysis, the court must always remain mindful that its focus "must be solely on principles and methodology, not on the conclusions that they generate," *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786, except that a Daubert challenge may succeed if the court "conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered," *General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). *See also, Hollander v. Sandoz Pharm. Corp.,* 289 F.3d 1193, 1205 (10th Cir.2002) Thus, the ultimate objective of *Daubert* scrutiny is to ascertain whether the proffered expert testimony is "not only relevant, but reliable," *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786.

An essential component of the relevance evaluation is the determination of whether the proposed expert testimony fits the issues in the case. In assessing "fit," as the Supreme court called it, the court must determine whether the "expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786 [internal quotation marks omitted].

■ As explained by the Court of Appeals:

[I]n fulfilling its *Daubert* obligations a trial court must also conduct a further inquiry into whether proposed testimony is sufficiently "relevant to the task at hand." *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786. Relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. The Supreme Court has described the consideration of relevant evidence as one of "fit." *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786. A trial court must look at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact. Even if an expert's proffered evidence is scientifically valid and follows appropriately reliable methodologies, it might not have sufficient bearing on the issue at hand to warrant a determination that it has relevant "fit."

*Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1234 (10th Cir.2004) *cert. denied sub nom.*

---

**16.** The proponent's burden may not be an evidentiary burden in the strict sense, but it is clear that, under Rule 104(a), it falls to the proponent to establish, and not to the opponent to refute, the admissibility of the evi-

dence proffered by the proponent. *See, e.g., United States v. Cherry,* 217 F.3d 811, 815 (10th Cir.2000) and *United States v. Metropolitan Enterprises, Inc.,* 728 F.2d 444, 448–49 (10th Cir.1984).

*White–Rodgers v. Bitler,* 546 U.S. 926, 126 S.Ct. 395, 163 L.Ed.2d 274 (2005).

In *Kumho,* the Court elaborated upon the Daubert gatekeeping function as applied to proposed expert testimony outside of the realm of classical scientific testimony. The Court emphasized that even where the proposed expert testimony is not scientific in the classical sense, the trial judge is nevertheless required to ascertain whether the expert "employs in the courtroom the same level of *intellectual rigor* that characterizes the practice of an expert in the relevant field." *Kumho,* 526 U.S. at 152, 119 S.Ct. 1167 (emphasis added).

It is clear that, in our circuit, the Daubert gatekeeping function is undertaken by means of a two-step analysis. *Ralston,* 275 F.3d 965 at 969. *First,* the court must determine whether the proposed expert is qualified. This requires an assessment of his "knowledge, skill, experience, training or education." *See* Rule 702 and *Ralston* at 969. *Secondly,* if the proposed expert is determined to be sufficiently qualified, the court must determine whether his opinions are "reliable" in the sense required by *Daubert* and *Kumho.* *Ralston,* 275 F.3d 965 at 969.

B. *Qualifications.*

In *Gardner v. General Motors Corporation,* 507 F.2d 525 (10th Cir.1974), our Court of Appeals noted that a proposed expert "should not be required to satisfy an overly narrow test of his own qualifications." *Id.* at 528. This self-evident admonition should be read in light of subsequent post-*Daubert* decisions.

The decision in *Ralston,* 275 F.3d 965, provides a good starting point, because that decision turned entirely on the expert's qualifications. Plaintiff asserted that the warnings accompanying an implanted orthopedic nail were inadequate. *Id.* at 967–68. The Court of Appeals affirmed the trial court's exclusion of the testimony of plaintiff's expert, a board-certified orthopedic surgeon who was also an associate professor of medicine at the University of Kansas Medical School. The expert's *general* credentials were clearly as good as could reasonably be expected, but she had done no research "specifically looking at this nail," *id.* at 969, and had not drafted a warning for a surgical device. *Id.* Her general credentials, though seemingly impressive as general credentials, were not good enough: "[M]erely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *Id.* at 970. The board-certified orthopedic surgeon's "reliance upon general principles and concepts" did not suffice. *Id.* Accordingly, her proposed testimony about the adequacy of the warning was not within the "reasonable confines" of her expertise. *Id.* If her proposed expert testimony had been within those "reasonable confines," her lack of specialization would have gone to the weight, not the admissibility, of her proposed expert testimony. *Id. See also,* as to specialization, *Broadcort Capital Corp. v. Summa Medical Corp.,* 972 F.2d 1183, 1194–95 (10th Cir.1992) (affirming trial court determination that an attorney with "some education and training in the field" was not qualified "as an expert in the securities area").

It should also be borne in mind that, under *Daubert* and Rule 702, "the question before the trial court [is] specific, not general. The trial court ha[s] to decide whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.'" *Kumho,* 526 U.S. at 157, 119 S.Ct. 1167 (quoting from 4 McLaughlin, Weinstein's Federal Evidence, ¶ 702.05[1], p. 702–33 (2d ed.1998).) Otherwise stated: "[t]he issue with regard to

expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir.1994), *cert. denied*, 513 U.S. 1111, 115 S.Ct. 902, 130 L.Ed.2d 786 (1995). *See also, Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir.2001) ("To begin with, we agree with the district court that Dr. Curtis ... easily qualifies as an expert under Federal Rule of Evidence 702. The real question is, what is he an expert about?") and *Westfed Holdings, Inc. v. United States*, 55 Fed.Cl. 544, 571 (2003), *rev'd in part on other grounds*, 407 F.3d 1352 (Fed.Cir.2005). Thus, on the issue of expert qualifications, *Ralston* and like cases establish that the qualifications of the proposed expert are to be assessed only after the specific matters he proposes to address have been identified. The controlling Tenth Circuit cases, exemplified by *Ralston*, establish that the expert's qualifications must be both (i) adequate in a general, qualitative sense (*i.e.*, "knowledge, skill, experience, training or education" as required by Rule 702) and (ii) specific to the matters he proposes to address as an expert.

## C. *Reliability.*

Under Rule 702, an expert with the necessary qualifications in the relevant field may give expert testimony if (i) the testimony is based upon sufficient facts or data, (ii) the testimony is the product of reliable principles and methods, and (iii) the witness has applied the principles and methods reliably to the facts of the case. Rule 702, Fed.R.Evid. *See, generally, Goebel v. Denver and Rio Grande Western R. Co.*, 346 F.3d 987, 991 (10th Cir.2003) (*Goebel II* ).

■ The evaluation for reliability cannot be permitted to evolve into an assessment of the ultimate persuasiveness of the proffered expert testimony. Faced with a Daubert challenge, expert testimony must meet "exacting standards of reliability...." *Weisgram v. Marley Company*, 528 U.S. 440, 455, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000). But those exacting standards are still applied within a well-defined framework, because *Daubert* scrutiny is neither a substitute for jury resolution of contested issues fairly presented by conflicting testimony from qualified experts nor a grant of uncabined discretion to district judges to reject expert testimony that rubs them the wrong way. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert* at 596, 113 S.Ct. 2786.

■ Thus, the court's "focus generally should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions." *Bitler*, 400 F.3d at 1233. As explained by Judge Becker for the Third Circuit, a challenge to proposed expert testimony "does not mean that plaintiffs have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 744 (3rd Cir.1994), *cert. denied sub nom. General Elec. Co. v. Ingram*, 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). The reliability standard is "lower than the merits standard of correctness." *Id.* Thus, the trial court's determination of "reliability," in the Daubert sense, is not a determination as to whether the expert's proposed testimony is substantively correct—determinations of

that kind would stretch most judges beyond their competence in most cases.[17]

The reliability determination must be made regardless of the subject of the proposed expert testimony:

> We conclude that *Daubert's* general principles apply to the expert matters described in Rule 702. The Rule, in respect to all such matters, "establishes a standard of evidentiary reliability." 509 U.S., at 590, 113 S.Ct. 2786. It "requires a valid ... connection to the pertinent inquiry as a precondition to admissibility." *Id.*, at 592, 113 S.Ct. 2786. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, see Part III, *infra*, the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." 509 U.S., at 592, 113 S.Ct. 2786.

*Kumho*, 526 U.S. at 149, 119 S.Ct. 1167.

*Daubert*, of course, involved a proffer of expert testimony in a classical scientific discipline—epidemiology. Bearing that context in mind, it is nevertheless appropriate to review the non-exclusive list of five factors which were provided by the Daubert court to guide trial court determinations of reliability. The Court said that the trial judge should (1) assess whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability, (2) determine whether the technique or theory has been subject to peer review and publication, (3) evaluate the known or potential rate of error of the technique or theory when applied, (4) ascertain the existence and maintenance of standards and controls and, (5) determine whether the technique or theory has been generally accepted in the scientific community. *See,* 509 U.S. at 590–94, 113 S.Ct. 2786.

*Kumho* made it clear that the gatekeeper function applies even where the proposed expert testimony is outside the realm of science in the classical sense. *Kumho* involved a proffer of engineering testimony in a product liability case. The *Kumho* decision makes it clear that, although the ultimate task of the trial judge, as gatekeeper, remains the same, the factors which were included in the nonexclusive list in Daubert are to be used only to the extent that they are logically applicable. *See Kumho*, 526 U.S. at 149, 119 S.Ct. 1167. Thus, for instance, it has been noted that the factors mentioned by the Court in *Daubert* do not neatly apply to expert testimony from a sociologist, *Tyus v. Urban Search Management*, 102 F.3d 256 (7th Cir.1996), and that lack of peer review or publication is not dispositive where the expert's opinion is supported by "widely accepted scientific knowledge...." *Kannankeril v. Terminix International, Inc.*, 128 F.3d 802, 809 (3rd Cir.1997). Moreover, as noted by the Advisory Committee in commenting on the 2000 amendments to Rule 702, courts both before and after *Daubert* have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the jury. Those additional factors which may be relevant depending on the circumstances include (1) whether the expert proposes to testify about matters growing naturally and directly out of his research, independent of the litigation, or

---

**17.** The relative competence of the trial judge and the expert is not a concern to the Supreme Court: "Of course, neither the difficulty of the task nor any comparative lack of expertise can excuse the judge from exercising the 'gatekeeper' duties that the Federal Rules of Evidence impose...." *Joiner,* 522 U.S. at 148, 118 S.Ct. 512.

whether he has developed his opinion expressly for the purpose of testifying, (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, (3) whether the expert has adequately accounted for obvious alternative explanations, (4) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting, and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. *See,* Advisory Committee notes to 2002 amendments, and cases there cited.

In sum, to make the Daubert assessment of reliability, the court—having found that the expert possesses the requisite expertise (if challenged), and having determined that the proposed expert testimony fits the issues in the case—must determine whether the expert's conclusions are the product of (i) application of that expertise using recognized and supportable methodologies, (ii) on the basis of adequate data which is (iii) rationally tied to the opinions which purport to be based on that data.

▬▬▬ "Under *Daubert,* any step that renders the analysis unreliable … renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely

misapplies that methodology." *Goebel II,* 346 F.3d at 992 (citations and internal quotations omitted); *Mitchell v. Gencorp Inc.,* 165 F.3d 778, 782 (10th Cir.1999). If the challenged expert testimony is crucial to the proponent's case, the result of a successful Daubert challenge may be entry of judgment as a matter of law. *Joiner,* 522 U.S. at 142–43, 118 S.Ct. 512; *cf. Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 at 327, n. 8, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007); *Weisgram,* 528 U.S. at 453, 120 S.Ct. 1011. *See, e.g., Truck Ins. Exchange v. MagneTek, Inc.,* 360 F.3d 1206, 1213 (10th Cir.2004); *Ralston,* 275 F.3d at 974. Although the standard of appellate review is no more stringent where the trial court's exclusion of expert testimony is outcome-determinative, *Joiner,* 522 U.S. at 142, 118 S.Ct. 512, it certainly would be—and is here—natural to proceed with great caution where the court's ruling may be dispositive.

### D. *Mr. Syson's Proposed Expert Testimony.*

Mr. Syson rendered his Rule 26 report of his proposed expert testimony on January 20, 2009. On March 30, 2009, after Mazda filed its Daubert motion and its motion for summary judgment, Mr. Syson signed a seventeen-page affidavit in aid of plaintiffs' opposition to Mazda's motions.[18]

18. Although the court, in addressing the pending motions, considers both Mr. Syson's Rule 26 report and his affidavit, it bears noting that the court and the defendant are entitled to treat the Rule 26 report as the definitive expression of Mr. Syson's proposed testimony. As Judge Shadur has put it: "[O]ne valuable byproduct of the 1993 version of Rule 26(a)(2)(B) has been the ability of opposing parties and courts to rely on a claimed expert's report under that Rule as definitive (see the 1993 Committee Note on that subject)." *Gentieu v. Tony Stone Images/Chicago, Inc.,* 214 F.Supp.2d 849, 851 (N.D.Ill.2002). The Rule 26 report of a retained expert must contain, among other things, "a complete statement of all opinions to be expressed and the basis and reasons therefor [and] the data or other information considered by the witness in forming the opinions." Rule 26, Fed.R.Civ.P. The Advisory Committee Notes accompanying the 1993 amendments to Rule 26 make it clear that the report must be "a detailed and complete written report, *stating the testimony* the witness is expected to present during direct examination, together with the reasons therefor." (Emphasis added.) The Advisory Committee further noted that the report requirement may result in reduction in the length of depositions of experts "and in many cases the report may eliminate the need for a deposition."

After providing an outline of his experience and qualifications, Mr. Syson's Rule 26 report, oddly enough, provides a nearly page-long discourse on crashworthiness and then describes his assignment and methods in this case. Doc. no. 74–16, at 7–8. Mr. Syson's acquisition of information, specific to this case, to support the analysis set forth in his Rule 26 report consists of (i) his inspection of the Mazda6, (ii) a review of a videotape of "Mazda's experts evaluating the subject vehicle" and (iii) a review of Ms. Graves' deposition *Id.* at 8, 11. He does not claim to have done any testing or to have taken any measurements. He states his conclusions at some length (*id.* at 8–20), citing no engineering literature in support of his conclusions.

On the issue of design defect, Mr. Syson expresses his conclusions as follows:

"**X. Accident Background and Analysis**

A. On February 11, 2007, Mrs. Graves was driving a 2006 Mazda6 four-door sedan, which she had rented. She got lost after attending a funeral.

B. She stopped the vehicle to ask directions in Hattiesburg, Mississippi and she has testified that she thought that she had put the shift lever into park. As she was exiting the vehicle it began to move backward. The Mazda6 backed over her. As a result of this interaction, she eventually became a paraplegic.

C. Inspection of the vehicle showed that it would not move from 'park' to 'reverse' due to a 'false park' condition. However, the shifter didn't move smoothly from drive in 'park' because the floor shift mechanism is gated to prevent this movement.

D. The Mazda6 shifter design is difficult to shift smoothly, since it has multiple detents between 'drive' and 'park.' Each detent is larger than the diameter of the shift lever. This unusual arrangement is illustrated, below:

(photograph omitted)

E. If the shifter was left in 'reverse,' videotape of testing by Mazda's experts showed that the vehicle would back up, just as the driver exits the vehicle. If the driver failed to jump out of the way of the reversing vehicle, he or she would be stuck by the vehicle as it backed up.

F. The Mazda6 shift pattern detents render the vehicle defective and unreasonably dangerous. The Mazda6 shift pattern is defective because Mrs.

---

Mr. Syson's Rule 26 report states that it is preliminary. Doc. no. 74–16, p. 20 (Syson report). This disclaimer, if intended to avoid reliance on the report for all purposes contemplated by Rule 26, is ineffective. *See Salgado by Salgado v. General Motors Corp.,* 150 F.3d 735, 741 n. 6 (7th Cir.1998), cited with approval by our Court of Appeals in *Kern River Gas Transmission Co. v. 6.17 Acres of Land,* 156 Fed.Appx. 96 at 102 (10th Cir. 2005) (cited as permitted by Tenth Circuit Rule 32. 1.) and *Jacobsen v. Deseret Book Co.,* 287 F.3d 936, 952 (10th Cir.), *cert. denied,* 537 U.S. 1066, 123 S.Ct. 623, 154 L.Ed.2d 555 (2002). This is because, as Judge Hartz has succinctly stated: "The orderly conduct of litigation demands that expert opinions reach closure." *Miller v. Pfizer, Inc.,* 356 F.3d 1326, 1334 (10th Cir.2004). For these reasons, the Motion of Defendant Mazda Motor Corporation to Strike Portions of the March 30, 2009 Affidavit of Stephen Syson, doc. no. 91, is meritorious. As is discussed below, Mr. Syson's March 30, 2009 affidavit, dated and filed after Mazda filed its Daubert motion and motion for summary judgment, advances significant new conclusions which were not expressed in his Rule 26 report. However, as will be seen, the new conclusions set forth in Mr. Syson's affidavit do not affect the result reached by the court on the Daubert motion and the motion for summary judgment. The Motion of Defendant Mazda Motor Corporation to Strike Portions of the March 30, 2009 Affidavit of Stephen Syson, doc. no. 91, is accordingly **STRICKEN** as moot.

Graves, an ordinary consumer, expects that an automatic transmission shifter would move smoothly into 'park.'

G. The design of the Mazda6 shift pattern was the producing/proximate cause of Mrs. Graves' injuries.

**XI. Design Alternatives**

A. Mazda should have used a shift gate that both permitted and encouraged a smooth shift into 'park' without a detent in the gate that blocks such a shift, and without requiring that the lever move laterally.

B. Most other vehicles use a push-button detent system that permits the shift lever to move smoothly between drive and reverse, as long as the push-button is pressed.

C. Such designs, that permit a smooth shift into 'park,' are common on most other floor shift automatic transmissions.

D. Therefore, human factors/ergonomic considerations show that an unfamiliar design, such as that in the Mazda6 creates a poor user interface.

E. The push-button, safer alternative design was available, technologically and economically feasible, and was used on Mazdas and on Ford vehicles that were made in the same assembly plant that manufactured the subject Mazda6. A typical example, the Mercury Cougar, is illustrated, below:

(photograph omitted)

[Caption below photograph.] The shifter design used on the Cougar was also used on the Mazda MX–6 and 626 made in the same factory.

F. Mazda also used a safer design on the Mazda3. This design is similar to that used on the 2000 Lexus LS400 that Mrs. Graves used to drive.

(photograph omitted)

A typical LS shifter is shown, below:

(photograph omitted)

*Mrs. Graves deposition testimony describes how she believed that the subject Mazda6 had a similar shift pattern to her 2000 Lexus LS400. This is not accurate. However, she reasonably expected that, since they appeared to be similar, they would perform in a similar way.* (Italics in original.)

G. Both the Mazda3 and the Lexus LS400 have a much smaller detent between 'reverse' and 'park,' that is approximately half the diameter of the shift lever. It is much easier to avoid accidentally leaving the vehicle in 'reverse,' when you believe it is in 'park,' with the Mazda3 and Lexus LS400 designs.

H. The safer alternative designs all were technologically and economically feasible and used on other model Mazda vehicles.

I. The safer designs would not affect the utility of the vehicle and would eliminate the risks, hazards and dangers of the design in the Mazda6.

J. The safer designs would meet the consumer's expectation that the shift lever would move smoothly from 'drive' into 'park.'

K. Applying either Oklahoma and Mississippi's definitions for design defect, unreasonably dangerous and strict liability establishes that subject vehicle was defective and unreasonably dangerous."

*Id.* at 8–12.

Mr. Syson's report proceeds, in Part XII, to a discussion of the inadequacy of a number of Federal Motor Vehicle Safety Standards (FMVSS) relating, with one exception, to matters that have nothing to do with this case (*e.g.,* standards relating to safety belts, child seats and vehicle roof strength). *Id.* at 12–13. The exception is

FMVSS 114 (49 CFR § 571.114), which, in some respects, relates generally to the functioning of automatic transmission shifters but (as Mr. Syson points out) does not address the shifter function at issue in this case. *Id.*

Following the discussion of the inapplicable federal standards, Mr. Syson's report provides the following additional commentary and conclusions:

"**XIII. Identification of Risks, Hazards and Dangers**

A. A safety engineer's primary responsibility is to identify potential risks, hazards and dangers associated with reasonably foreseeable uses and misuses of a product. Then, he should attempt to design out the dangers, guard against them or, as a last resort, warn about them.

B. Mazda's engineers should have used one of the many available techniques to analyze the safety of the Mazda3 shifter design. Specifically, among other safety issues, they should have analyzed the dangers of unfamiliar drivers using an uncommon shift pattern, which hindered the driver's ability to move the shifter smoothly between 'drive' and 'park.' Mazda, apparently, failed to do so.

C. Shifter problems, which result in a vehicle being left in gear, when the driver believes he or she is in 'park' create a risk of serious injury or fatality, since the vehicle can run over the occupant. Mazda should have taken the necessary engineering steps to design a shift mechanism for the Mazda3 with a reduced risk of shifter failure, or guarded against shifter failure.

D. Many vehicles have transmission/speed activated door locks. It would be reasonable if the doors remained locked until the vehicle was firmly in "park," or the crash sensing system determined that a sufficient time had passed after a collision.

**XIV. Mazda's Negligence**

A. Mazda filed to act with reasonable care since they failed to properly analyze the human factors issues inherent in an unusual shift pattern.

B. Mazda failed to conduct use versus misuse studies, or any other user studies to assess the effect on driver behavior of a novel shift pattern.

C. Mazda failed to act with reasonable care, since Mazda failed to assess the consequences of an unusual shift pattern when the vehicle is rented by a driver who is used to a pattern than [sic] permits smooth shifts into 'park.'

D. Mazda failed to act with reasonable care since it never conducted appropriate safety systems analysis of the shifter design, including but not limited to:

● Preliminary Hazard Analysis (PHA) (FAA, 2000)

● Failure Mode and Effects Analysis (FMEA)

● Fault Tree Analysis

● Risk Hazard and Danger Analysis

● Root Cause Analysis

● Design Failure Mode Analysis (DFMA)

 * * * [19]

---

**19.** Omitted is a series of generic descriptions, not couched in terms of the facts of this case, of the analytical tools referred to in the bullet points in Part XIV (D). Doc. no. 74–16, pp. 14–19. Mr. Syson's report contains no indication that he performed any of these analyses in this case, nor does it provide support for his assertion that Mazda did not perform them. (Mr. Syson's "failure analysis," Report, Part IX (A), should not be confused with a Failure Mode and Effects Analysis (FMEA), Report, Part XIV(F). Mr. Syson does not claim to have performed a FMEA. Mr. Syson likens his "failure analysis" to an exercise in "differential diagnosis." *Id.*, Part IX(B). A FMEA is an altogether different exercise, as is recognized both in Mr. Syson's report, e.g., Part XIV(F), and in the engineering profes-

K. Each of the above methods permits an engineer to discover how to prevent mechanical and human factors interface problems, before they start. Failure to use such methods is negligent and results in safety defects. Designs that do not contemplate risks, hazards and dangers, as described above, are defective and unreasonably dangerous.

L. Applying these engineering principles might explain why Mazda why Mazda [sic] elected to return to the Mazda3 shift detent pattern.

M. Mazda's negligence, as it related to the design of the Mazda6 shifter detent pattern, was the proximate/producing cause of Mrs. Graves' injuries.

N. Applying either Oklahoma or Mississippi's standard for negligence to the facts, above, establishes that Mazda was, in fact, negligent.

### IX. Blaming Mrs. Graves

It is anticipated that Mazda and its experts will try to blame Mrs. Graves for causing this incident. Such a position is flawed for a number of reasons. First, engineers must conduct the proper engineering analysis to design out, guard against and warn about foreseeable use and foreseeable misuse situations. Mazda failed to do so. Second, Mazda and its engineers are expected to thoroughly test, evaluate and analyze its vehicles and its vehicle performance characteristics. Mazda failed to do so. Third, Mazda is supposed to be the 'expert in the field.' Fourth, imagine this was an intersection collision with a head on impact severe enough to deploy the airbags and substantial injuries were sustained because the Mazda airbags did not deploy. This scenario would be a Mazda problem, not the negligent driver's problem. Fifth, imagine the Titanic and the 1,517 lost people who drowned hours after the collision with an iceberg. Did they die because the ship hit that iceberg? Of course not. They died because there were not enough lifeboats aboard the Titanic to protect everyone. Those without lifeboats drowned. No one aboard the Titanic died in the collision with the iceberg. Sixth, blaming a person for causing an accident and the resulting injuries overlooks decades of crashworthiness research, development and the preamble to the FMVSS."

*Id.* at 13–20.

As has been noted, Mr. Syson signed a seventeen-page affidavit after Mazda's Daubert motion and motion for summary judgment were filed. The affidavit is attached to plaintiffs' responses to the Daubert motion and to the motion for summary judgment. *See,* Doc. no. 82–2 (Daubert response) and doc. no. 83–2 (summary judgment response). Although generously garnished with self-laudatory comments, Mr. Syson's affidavit, with two exceptions, adds nothing of substance to the defect-related contentions set forth in his Rule 26 report. The two new contentions are (i) that, at the time of the accident, the shifter was between park and reverse, and (ii) that there are actually two types of "false" park condition, and this accident was caused by one of them. Doc. no. 83–2, ¶¶ 30–37, 49.

As for the first of the two new contentions (shifter between park and reverse), Mr. Syson's Rule 26 report states that "the shifter of the Mazda was in 'Reverse,'

sion generally. *See, e.g.* Dorothy Lueck, *Stop Failure In Its Tracks,* Iowa State University Center For Industrial Research and Service, *CIRAS News,* Vol. 31, No. 1, Fall 1996, http://www.ciras.iastate.edu/publications/management/failure.asp (last visited December 10, 2009). A FMEA is a systematic engineering analysis undertaken for the purpose of recognizing and evaluating potential failures of a product. *Id.*)

when she believed it was in 'Park.' " Doc. no. 74–16, p. 7. On this point, Mr. Syson's Rule 26 report and his affidavit could theoretically be reconciled on the basis that the Mazda6 might actually have gone into reverse with the shifter between park and reverse. However, Mr. Syson has opined that there were "no apparent design flaws in the mechanical linkage on/in the Mazda6 vehicle." Doc. no. 83–2, ¶ 33. Moreover, the factual condition posited for Mr. Syson's ultimate conclusion that the Mazda6 was "defective and unreasonably dangerous" doc. no. 74–16, p. 9, is: "If the shifter was left in 'reverse'. . . ." *Id.* In any event, Mr. Syson's Rule 26 report contains no intimation that the shifter was, as his affidavit says, "actually in between 'reverse' and 'park'. . . ." *Id.*, ¶ 37.

With respect to the second new contention (that the shifter was in a false park condition and this caused the accident), Mr. Syson states in his Rule 26 report that: "Inspection of the vehicle showed that it would not move from 'park' to 'reverse' due to a 'false park' condition." Doc. no. 74–16, p. 9. This conclusion that a "false park" did not occur in this case is the singular reference, in Mr. Syson's Rule 26 report, to the false park concept. His Rule 26 report makes no reference to any failure by Mazda to test for a false park tendency or to any likelihood that his proposed alternative design would cause fewer false park incidents. *Id.*, pp. 10–12, 14–20. In contrast, Mr. Syson's affidavit expounds a false park theory at considerable length. Doc. no. 83–2, ¶¶ 30–37. In his affidavit, Mr. Syson defines two kinds of false park occurrence:

"c. That the subject Mazda6 had a mechanical problem, which resulted in the vehicle jumping from park into reverse, a.k.a. false park;

d. Or, that Mrs. Graves placed the shifter up between park and reverse, while believing that she had put the shifter up in the park position, a.k.a. false park."

*Id.*, ¶ 30.

Mr. Syson goes on, in his affidavit, to rule out the first type of false park and to conclude, for the first time, that scenario (d) is what actually occurred—the shifter was placed between park and reverse, a condition which he also dubs "false park."

In his affidavit, Mr. Syson does not describe any new testing or factual investigation to support his new conclusion.[20] He cites two technical publications, versus none in his Rule 26 report, doc. no. 83–2, ¶¶ 16, 38, 41, but those publications touch on the issues in this case, if at all, only at a very high level of generality.

### E. *Analysis—qualifications.*

██ In evaluating Mr. Syson's qualifications, the court must, in essence, decide whether he has sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case. *Kumho*, 526 U.S. at 157, 119 S.Ct. 1167. Defendant argues that Mr. Syson is not qualified to express the opinions which he proposes to express in this case because "his expertise does not encompass the specific area of gear shift design or human factors analysis." Doc. no. 70, at 11.

As a preliminary matter, it is necessary to bear in mind the area of expertise which Mr. Syson purports to apply in this case. The predominant discipline which Mr. Syson brings to bear in this case is human factors engineering, not mechanical engineering. Doc. no. 74–16, at 6, 9–12, 14. Mr. Syson does not assert that there were

---

**20.** New testing might well, in any event, have jeopardized the admissibility of Mr. Syson's testimony regardless of its merits under *Dau-* *bert* and *Kumho*. See the discussion at n. 18, above.

any "apparent design flaws in the mechanical linkage on/in the Mazda6 vehicle." Doc. no. 83–2, ¶ 33. No manufacturing defect, Miss.Code Ann. § 11–1–63(a)(i)(1), is asserted. As is discussed below, Mr. Syson's central contention in this case is that the Mazda6 shifter was defective because it was, he asserts, different from the shifter to which Ms. Graves was accustomed, it had shift lever detents that were deeper than they should have been, and it was not as safe as a straight shifter. It does not take a mechanical engineer to prove the functionality of a straight shifter as a generic design category—that is a common design and has been for a long time. Mr. Syson's focus is on the interaction between the driver and the shifter. For these reasons, Mr. Syson's analysis is couched in terms of human factors engineering, not traditional mechanical engineering. The fact that he apparently has not designed an automotive shifter is of little consequence.

As for Mr. Syson's expertise in the realm of human factors engineering, his Rule 26 report reflects substantial academic and practical work in the human factors realm. Doc. no. 74–16, at 6. In his affidavit, Mr. Syson states that his automotive engineering experience includes the evaluation of the human factors involved in "all mechanical systems in passenger vehicles." Doc. no. 83–2, ¶ 12. He states in his affidavit that he was once retained "to design, develop and analyze gear shift mechanisms for" a company he identifies as "B & M." *Id.* at ¶ 14. This work included human factors analysis. *Id.*

Taking into account Mr. Syson's education (bachelor's degree in mechanical engineering and master's degree in engineering), training and experience, and bearing in mind, of course, that the question of whether Mr. Syson possesses the requisite expertise is a matter altogether separate from the question of whether his proposed

testimony satisfies the reliability component of the analysis under *Daubert* and Rule 702, the court concludes that Mr. Syson does have the expertise necessary to express the opinions he proposes to express in this case.

F. *Analysis—reliability.*

The sufficiency of Mr. Syson's proposed expert testimony to satisfy the requirements of *Daubert* and *Kumho* and their progeny should be considered with a clear understanding of the elements of plaintiffs' claim and of their present factual theory of liability. To recap: Plaintiffs' design defect claim requires them to establish (i) that the Mazda6 was defective, (ii) that the defect rendered the Mazda6 unreasonably dangerous, (iii) that the defective and unreasonably dangerous condition of the Mazda6 proximately caused the plaintiffs' damages, (iv) that Mazda knew or should have known of the danger that caused the damage, (v) that the Mazda6 failed to function as expected, (vi) that there was a feasible design alternative that would have to a reasonable probability prevented the harm, and (vii) that the feasible design alternative would not impair the utility, usefulness, practicality or desirability of the Mazda6 to users or consumers. Miss. Code Ann. § 11–1–63.

Plaintiffs' briefs and Mr. Syson's affidavit make clear the essentials of plaintiffs' factual theory:

"Mrs. Graves placed the shifter up between park and reverse, while believing that she had put the shifter up in the park position." Doc. no. 83 (plaintiffs), at 22.

"While the Mazda6 shifter appears to a lay person to be the same as other Mazda vehicles (as well as the Toyota and Lexus owned by the Plaintiffs), it requires different shift lever movement to achieve 'park.' *This is what renders the*

*Mazda6 shifter defective and unreasonably dangerous."*

*Id.* at 6 (emphasis added).[21]

The court now turns to a determination of the sufficiency of Mr. Syson's proposed expert testimony.

(1) Mr. Syson's proposed expert testimony is deficient on the issue of whether the shifter on the Mazda6 is defective and unreasonably dangerous.

 The centerpiece of plaintiffs' theory of liability, and, consequently, of Mr. Syson's proposed expert testimony, is the contention that the shifter on the Mazda6 was different from anything Ms. Graves was used to (a fact that the court assumes to be true, notwithstanding Ms. Graves' deposition testimony[22] and the photographic evidence discussed at p. 4, above) and that "[t]his is what renders the Mazda6 shifter defective and unreasonably dangerous." Doc. no. 83, at 6. Mr. Syson elaborates as follows:

"F. The Mazda6 shift pattern detents render the vehicle defective and unreasonably dangerous. The Mazda6 shift pattern is defective because Mrs. Graves, an ordinary consumer, expects that an automatic transmission shifter would move smoothly into 'park.'

G. The design of the Mazda6 shift pattern was the producing/proximate cause of Mrs. Graves' injuries."

Doc. no. 74–16, p. 9 (Syson report).

The criticism that the shifter would not "move smoothly into 'park' " (*e.g.,* the characteristic that made the shifter different and therefore defective) is based on the fact that the Mazda6 shifter is a gated shifter with (Mr. Syson asserts) relatively deep shift lever detents, rather than a straight shifter. Doc. no. 74–16, pp. 9–11 (Syson report).

Although Mr. Syson's conclusions—including his central conclusion that the Mazda6 shifter is defective because it is different—are purportedly based on the application of engineering principles, his application of those principles to the shifter on the Mazda6 is not grounded in any objective data or specifically applicable engineering standards. Although Mr. Syson's Rule 26 report recites his substantial experience with engineering testing in a variety of contexts (as well as substantial experience with analysis of engineering test data), doc. no. 74–16, pp. 4–5, he did no testing to quantify—or even to confirm the existence of—any exceptional propensity of the gated shifter on the Mazda6 to cause driver confusion about the actual position of the shift lever. He repeatedly criticizes the shifter on the Mazda6 because the depth of the shifter detents exceeds the diameter of the shift lever, *e.g.,* doc. no. 74–16, pp. 9, 12 (Syson report), doc. no. 83–2, ¶ 36 (affidavit), but he cites no standards that would counsel against that design. His Rule 26 report cites no applicable standards at all, and his affidavit cites only two published standards—one that advises that hazards should be eliminated, guarded against or warned against, and one that advises that drivers' problems often result from the designer's decision to use the driver interface for artistic or aesthetic experimentation. *Id.,* ¶¶ 16, 38. Thus, on the question of whether the Mazda6 shifter is defective and unreasonably dangerous to the "user or consumer," Miss.Code Ann. § 11–1–63(a),

**21.** Or, as stated by Mr. Syson: "It is the very fact that the Mazda6 shifter appears to a lay person (and apparently to the untrained eye of Mazda's attorneys) to be the same as other Mazda vehicles, the Toyota and Lexus, yet requires different shift lever movement to achieve 'park' that renders the shifter defective and unreasonably dangerous." Syson affidavit, ¶ 49 (doc. no. 83–2).

**22.** Doc. no. 74–14, p. 131.

although he repeatedly cites "human factors" considerations in support of his conclusions, *e.g.*, doc. no. 74–16, pp. 10, 14, 19 (Syson report), his human factors evaluation of the Mazda6 shifter is not founded on any analysis of objective data which would facilitate a determination that his proposed expert testimony is the product of reliable principles and methods applied reliably to the facts of the case. Rule 702, Fed.R.Evid.

■ Although human factors engineering is a legitimate discipline,[23] in a forensic setting, the application of human factors principles can be highly subjective and thus conveniently malleable. Human factors testimony which is proffered without a showing of objective support (testing or, at least, independent support in relevant literature) invites close scrutiny to determine whether the expert's work is an exercise in facile advocacy (*e.g.* the "ipse dixit of the expert"). Mr. Syson's proposed expert testimony fails the test. This conclusion is entirely consonant with our circuit's treatment of Daubert challenges in similar contexts. *E.g.*, *Milne v. USA Cycling*, 575 F.3d 1120, 1134 (10th Cir.2009) (opinions not supported by "empirical or quantitative studies"); *United States v. Rodriguez–Felix*, 450 F.3d 1117, 1126 (10th Cir. 2006), *cert. denied*, 549 U.S. 968, 127 S.Ct. 420, 166 L.Ed.2d 297 (2006) (*Daubert* not satisfied by casual mention of a few scientific studies which fail to demonstrate that an expert's conclusions are grounded in established research, recognized in the scientific community, or otherwise accepted as scientific knowledge); *Black v. M & W Gear Co.*, 269 F.3d 1220, 1237 (10th Cir. 2001) (expert "had not conducted any tests or calculations to support his opinion"). Moreover, even if Mr. Syson's conclusions on the issue of defect were supported by an applicable engineering standard, that alone would not suffice: "Although the fact that a piece of equipment fails to comply with published engineering standards may allow a jury to infer that the product is defective, it does not establish, by itself, that the defect made the product unreasonably dangerous to an extent beyond that which would be contemplated by the ordinary consumer." *Alfred v. Caterpillar, Inc.*, 262 F.3d 1083, 1089 (10th Cir. 2001), *cert. denied*, 535 U.S. 928, 122 S.Ct. 1298, 152 L.Ed.2d 210 (2002) (involving challenge to expert's human factors analysis of interaction between speed control and gear shift on asphalt paver).

(2) Mr. Syson's proposed expert testimony is deficient on the issue of whether there is a feasible design alternative.

As has been noted, under Mississippi law, it is not sufficient for a plaintiff in a design defect case to show that the product in question is defective and unreasonably dangerous and caused the harm for which plaintiff seeks to recover. Plaintiff must also establish the existence of a feasible design alternative which would in reasonable probability have prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers. If this element is not established, it makes no difference that the product may be defective and unreasonably dangerous. *Williams v. Bennett*, 921 So.2d 1269, 1274–75 (Miss.2006).

The alternative design Mr. Syson advocates is "[a] gearshift that lacks deep detents but provides a relatively straight movement from drive up to park...." Doc. no. 83–2, ¶ 37 (affidavit). As has been noted, the reference point in evaluat-

23. *See, generally,* the website of the Human Factors and Ergonomics Society, www.hfes. org.

ing whether a proposed alternative design impairs the utility, usefulness, practicality or desirability of the product is users or consumers in general. Miss.Code Ann. § 11–1–63(f); *Williams v. Bennett,* 921 So.2d 1269, 1276 (Miss.2006), quoting from *Wolf v. Stanley Works,* 757 So.2d 316, 322 (Miss.Ct.App.2000).

■ Given the clarity of Mississippi's statutory requirement of a feasible alternative design, it comes as no surprise that "the proper methodology for proposing alternative designs includes more than just conceptualizing possibilities." *Watkins v. Telsmith, Inc.,* 121 F.3d 984, 992 (5th Cir. 1997) (applying Mississippi law). Failure to test the proposed alternative can be fatal to the admissibility of the expert's proposed testimony. *Id. See also, Vandiver v. Ohio River Co.,* 174 Fed.Appx. 206, 207–08 (5th Cir.2006) (applying Mississippi law).

Of course, no testing is needed to demonstrate that a straight shifter *could have been* used in the Mazda6. Millions of cars in daily use attest to the fact that a straight shifter, as a generic design category, could have been used. However, a design that could have been used, and a design that satisfies Mississippi's two-pronged statutory requirement for a "feasible design alternative," Miss.Code Ann. § 11–1–63(f), are two entirely different things.

Mr. Syson cites neither testing nor engineering literature to establish that the Mazda6 "could have been made safer by the adoption of a reasonable alternative design," *Williams v. Bennett,* 921 So.2d 1269, 1275 (Miss.2006), consisting of a straight shifter having a different tactile response than the gated shifter. He posits only, and without objective support, that the gated shifter on the Mazda6 was causally defective as used by Ms. Graves on the day of the accident. Because he has neither done testing to compare the relevant aspects of the performance of the shifter in the Mazda6 with his proposed alternative nor cited relevant engineering literature to support his thesis, he has "failed to adduce any evidence to demonstrate the *extent of the risk that the alternative design would have avoided. . . .*" *Williams v. Bennett,* 921 So.2d 1269, 1277 (Miss.2006), quoting from *Johnson v. Davidson Ladders, Inc.,* 403 F.Supp.2d 544, 550 (N.D.Miss.2005) (emphasis added). Thus Mr. Syson's proposed expert testimony, at its apogee, articulates an arguable basis for a designer's general preference for straight shifters over gated shifters. That arguable designer's preference can hardly be equated with a feasible design alternative in the sense contemplated by Mississippi's product liability statute.

As was the case with his treatment of the issue of product defect, Mr. Syson, having cited no data or testing that would shed light on the efficacy of his proposed alternative to the shifter design in the Mazda6 in the hands of the ordinary user or consumer, offers only his general commentary (sometimes called the *ipse dixit* of the expert) in support of his design preference. As Chief Judge Henry noted in *Hollander,* even if a product may engender "serious concerns" in a non-litigation setting, that fact does not license plaintiff's expert to make "speculative leaps" to reach his conclusions. *Hollander,* 289 F.3d at 1213. The proffer of an alternative design (even if the design is feasible, or even preferable, in a general sense) will shed no light on the issue of whether the proposed design satisfies Mississippi's standard for a feasible design alternative unless a meaningful comparison (*i.e.,* a comparison validated by the use of techniques recognized in *Daubert* and *Kumho* and their progeny) provides the trier of fact with a reasonable basis for a finding that the proposed alternative demonstrably reduces the foreseeable risks of ordi-

nary use. For this reason, as the Mississippi Supreme Court succinctly put it: "[t]he mere mention of a design alternative by an expert comes well-short of lending evidentiary guidance to a court." *Williams v. Bennett,* 921 So.2d 1269, 1275 (Miss.2006).

For this reason, aside from the deficiencies in Mr. Syson's proposed expert testimony on the issue of defect, the court concludes that Mr. Syson's proposed expert testimony with respect to his suggested alternative design does not satisfy the demands of Mississippi law or Rule 702. It is not "based upon sufficient facts or data," has not been demonstrated to be "the product of reliable principles and methods," and does not demonstrate the application of relevant engineering "principles and methods reliably to the facts of the case." Rule 702, Fed.R.Evid.

## V. *Conclusion.*

The deficiencies in Mr. Syson's proposed expert testimony leave the plaintiffs unable to establish a submissible case on the issues of whether there was a defect in the design of the Mazda6 shifter, whether the shifter was unreasonably dangerous to the user or consumer, and whether there existed a feasible design alternative. Consequently, plaintiffs' claims fail as a matter of law. *Watkins v. Telsmith, Inc.,* 121 F.3d 984, 993 (5th Cir.1997) (applying Mississippi law). Defendant's motion for summary judgment will be granted.

In accordance with the foregoing memorandum opinion:

Doc. no. 70, the Motion of Mazda Motor Corporation to Exclude the Testimony and Opinions of Stephen R. Syson is **GRANTED;**

Doc. no. 73, Defendant's Motion *In Limine* Seeking to Limit Plaintiffs' Expert's Testimony and/or His Reliance On, Or Utilization of, Any Exhibits Not Contained in His Rule 26 Report is **STRICKEN AS MOOT;**

Doc. no. 74, Defendant's Motion for Summary Judgment is **GRANTED;**

Doc no. 75, Plaintiffs' Motion *In Limine* to Preclude Keisuke Miyoshi from Testifying is **STRICKEN AS MOOT;**

Doc. no. 76, Plaintiffs' Motion to Exclude Duplicative Expert Testimony is **STRICKEN AS MOOT;**

Doc. no. 77, Plaintiff's Notice of Plaintiffs' Motion to Limit the Testimony of James Schultz, One of Defendant's Experts is **STRICKEN AS MOOT;** and, Doc. no. 91, Motion of Defendant Mazda Motor Corporation to Strike Portions of the March 30, 2009 Affidavit of Stephen Syson is **STRICKEN AS MOOT.**